JEFFREY A. FISHER, Plaintiff-Appellant, v. HARRY W. PARKS, Indiv. and d/b/a Southern Illinois Medical Business Associates, *et al.*, Defendants-Appellees.

Fifth District   No. 5—91—0629

Opinion filed August 3, 1993.—Rehearing denied August 26, 1993.

Ted Armstrong, of Edwardsville, and William James O'Herin, of Florissant, Missouri, for appellant.

Freeark, Harvey, Mendillo, Dennis, Wuller & Buser, P.C., of Belleville (Ray H. Freeark, Jr., and Ransom P. Wuller, of counsel), for appellees.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

Jeffrey A. Fisher filed a complaint against Harry Parks and Steven Nuernberger, alleging that he had been a partner with the defendants in a medical pathology practice known as Southern Illinois Medical Business Associates (SIMBA) and that the defendants wrongfully expelled him from the partnership and failed to account for his financial interest in the business. The trial court, sitting without a jury, entered judgment for the defendants. Plaintiff appeals. We affirm.

The first issue on appeal is whether the trial court erred in finding that defendants complied with the procedural requirements of the partnership agreement. Specifically, Fisher argues that the notices of expulsion were not in accordance with the agreement and that he was wrongfully denied a 60-day probationary period. To resolve this issue, we must turn to the testimony adduced at trial.

In July of 1977, pathologists Steven Nuernberger and Harry Parks entered into a partnership agreement to provide clinical pathology services under the name of Southern Illinois Medical Business Associates. In July of 1978, Jeffrey Fisher, also a pathologist, joined the partnership. Throughout the term of the partnership, two of the partners in SIMBA would service several rural hospitals in Southern Illinois, including those at Sparta, Pinckneyville, Murphysboro, and DuQuoin. SIMBA also serviced the hospital in Mt. Vernon and Alton Memorial Hospital in Alton. At each hospital SIMBA pathologists operated the hospital's laboratory, supervised and trained hospital lab personnel, participated in the training of medical staff, and undertook any clinical pathology while on duty. The remaining partner would service and supervise SIMBA's Collinsville-Belleville laboratory and was on call for the coroners or physicians in St. Clair and Madison Counties to perform autopsies. In addition, all of the partners were on

call to do any autopsies which were required on Saturday and Sunday. The duties of the three partners were rotated.

Neither Parks nor Nuernberger had any criticism of Fisher's performance during his first year with the partnership. The first complaint regarding Fisher came in September of 1979, from Mr. Nehrt, the administrator of the Sparta Community Hospital. Nehrt withheld a day's pay from SIMBA amounting to $250, for Fisher's failure to attend certain meetings. Parks testified that he believed SIMBA could forfeit its contract with Sparta Community Hospital if these actions continued. Parks testified that during this same period he was given the impression from others that Fisher had begun a practice of jogging during office hours when he should have been attending to matters at the laboratory or servicing client hospitals. Parks testified that this practice continued from the fall of 1979 until Fisher's departure from SIMBA in 1981.

Mary Cruzvergara, Ruth Joachimsthaler, and Arna Trotter, employees of SIMBA, testified that because of Fisher's jogging there were times when he could not be reached either at a particular hospital or at the laboratory. They testified that although the laboratory hours were 8 a.m. to 5 p.m., Fisher usually spent six hours at the laboratory, which included the 45 minutes to an hour and a half he spent jogging. Cruzvergara and Trotter both testified that Fisher's jogging during working hours and keeping minimal hours never changed. Cruzvergara testified that once Fisher got lost while jogging in Collinsville and someone from the laboratory had to retrieve him. She recalled that in early 1989 Fisher told her that he did not feel pathology was for him and that he would be happier practicing holistic or nutritional medicine in New York.

There was also testimony that Fisher jogged while he was on duty at client hospitals. Nancy Powles, a medical technologist at St. Joseph's Hospital in Murphysboro, testified that Fisher went out jogging more than half the times that he visited the hospital and that he would do this shortly after he arrived. On a number of occasions Powles had to tell physicians that Fisher was unavailable because he was out jogging. Jo Ellen Heggemeier, a medical technologist at Sparta Community Hospital, testified that Fisher went jogging nearly every time that he visited the hospital. Due to his jogging, he was unavailable for meetings and was not as available to her or the laboratory staff as Parks and Nuernberger were. She also testified that while Nuernberger's, Parks', and Fisher's hospital visits averaged two hours, Fisher's two hours included the time he spent jogging.

David Hosler, chief executive officer of Marshall Browing Hospital in DuQuoin, testified that, during the time SIMBA has provided services to the hospital, he has been critical of only one pathologist, Jeffrey Fisher. Hosler testified that Fisher would spend minimal time at the hospital and was not fulfilling the obligations for which the hospital had contracted with SIMBA. This matter, along with other problems, caused Hosler to rewrite the contract with SIMBA to specify more clearly the length of time a physician was required to spend at the hospital.

Ruth Lafferty, a pathology secretary at Alton Memorial Hospital, testified that Fisher serviced Alton Memorial Hospital on numerous occasions and that he would go jogging nearly every day. Lafferty testified that on one occasion Fisher could not be reached to perform a frozen section because he was out jogging.

SIMBA was also responsible for performing autopsies in St. Clair and Madison Counties. Alva Busch, a crime-scene technician for the State of Illinois, testified that in November of 1979 Fisher performed an autopsy of a man who was shot through the head. Busch testified that he feels it is difficult for a pathologist "not knowing the circumstances of the other facts of the case to be able to sit and make a total evaluation of what occurred to a body at a given time without knowing the surrounding facts of the case." Busch cited an incident where Fisher did not wait for Busch to present evidence of the crime-scene investigation but rendered his report without that information. As a result, Fisher's autopsy report was in error because he showed the entry and exit wounds in reverse. Busch testified that he believed some of Fisher's "priorities were a bit out of line."

Madison County Assistant Coroner Dick Mizell testified that Fisher was always in a hurry to do things and that he always talked of jogging. Mizell recounted an occasion where he wanted to have a body re-x-rayed, but that Fisher did not want to wait the half hour it would have taken to re-x-ray the body. Mizell spoke with the coroner about problems he had with Fisher. Mizell testified that he preferred not having Fisher perform autopsies.

Dr. Nuernberger wrote Fisher and Parks a letter dated March 27, 1980, outlining particular complaints he had regarding the partnership and the activities of his partners. With regard to Parks, Nuernberger complained of Parks' failure to complete autopsy reports in a timely manner. Parks agreed that he had been late in completing the reports, but he testified that he corrected the problem after receiving Nuernberger's letter.

In the letter of March 27, particular references regarding Dr. Fisher were set forth:

"I have been approached by the nursing coordinator at St. Joseph's Hospital in Murphysboro with a complaint concerning Dr. Fisher and the clinical pathological conferences which he has or has not given depending on whom you talked to. The nurse has stated that he has been late to both of his conferences number 1, and number 2, instead of finishing the first conference *** he did a frozen section and went jogging instead of returning to finish the conference. This I feel is quite deplorable and shows an extreme lack of consideration to the fellow physicians who are giving their time and effort to be at the conference. I see no reason for any of us to be late to a CPC since it is scheduled as much as three months in advance. ***

***

Once again, it appears to myself and to the employees of SIMBA that Dr. Fisher is spending more time in personal life than he is concerned about the business. I do not like him leaving surgical specimens in baskets, buckets or whatever for me to do on the next day. It is easy enough to open a colon and to take biopsies and leave them in cassettes in formalin over night rather than leave the entire specimen for someone else to do. If he is in such a rush, that he cannot do the specimens, I think he had better look for a new job.

Despite these complaints and the seriousness I attribute to them, I have enjoyed for the most part our relationship over the past year. I just do not want the quality of service rendered by SIMBA to its customers and physicians to deteriorate from the standards set in 1977 when I arrived at SIMBA. ***

***

*** I write this letter with the hope that we can improve our service and resolve our differences in a manner which would preclude my leaving SIMBA."

In an undated letter addressed to Nuernberger, Fisher denied any alleged deficiencies in his own performance.

In April of 1980, SIMBA received a letter from Dr. Thomas, a pathologist and director of laboratories at Memorial Hospital in Carbondale. Thomas described an oversight on the part of Dr. Fisher, wherein Fisher failed to send tissue from a malignant adenocarcinoma to the clinical laboratories in St. Louis for estrogen and progesterone receptor assays. In addition to detailing this incident, Thomas noted

that Fisher gave the personnel in the histology laboratory and the pathology office the impression that he was terribly rushed and really did not have time to deal with the load of work confronting him.

Admitted into evidence was a list of SIMBA's Sunday autopsy schedule from January 1980 through June of 1981, reconstructed from reports of the coroner's physician on file at SIMBA. According to the schedule, there were six occasions where Fisher was on call to perform autopsies but could not be located. In each instance Parks or Nuernberger was called to perform the autopsy. It is not documented whether Nuernberger or Parks was ever unavailable when he was otherwise scheduled to perform autopsies. Documented in the schedule are three incidents Fisher was allegedly involved in in 1980:

> May 1, 1980—Patient autopsied and signed out as death due to natural causes, *i.e.*, lobar pneumonia. Medical record indicated patient strangled in bedside rail and ceased breathing. CPR given but patient remained comatose until her death three weeks later. Corrected report dictated by Dr. Fisher six weeks after autopsy.

> May 13, 1980—Numerous inaccuracies in Dr. Fisher's report brought out in letter to Coroner Dallas Burke from parents of decedent and corrected addendum report requested. No corrected addendum report found in SIMBA files.

> September 26, 1980—Dr. Fisher's autopsy report erroneously attributes multiple skull fractures and rib fractures to homicide when reliable witnesses at the scene indicated he had been run over by a semi-trailer truck after jumping/falling into the traffic lane on I-270, while intoxicated. Dr. Steven P. Nuernberger was asked to render a second opinion correcting the erroneous interpretation of Dr. Fisher.

Nuernberger testified that, as a result of Fisher's continued inability and disinterest in performing, he and Parks decided to expel Fisher from the partnership. Nuernberger and Parks testified that they held an informal meeting on November 5, 1980, to discuss Fisher's deficiencies. Fisher was not advised of the meeting. As a result of their meeting, Nuernberger and Parks sent Fisher a letter by certified mail, dated November 5, 1980, which provided as follows:

> "This is to give Dr. Fisher a 60 day written notice of expulsion according to the contract signed by Dr. Fisher, Dr. Nuernberger, and Dr. Parks (Section XIII, paragraph A, 'ground' number 5).

> It is felt by the remaining partners that Dr. Fisher has continuously failed to fulfill his obligations and duties as a partner

as stated in Section IV, paragraph A. He has purposely and repeatedly failed to cover SIMBA Laboratory when assigned 'CB' on the schedule, he has caused SIMBA to be fined by an Administrator, thus tarnishing the excellent reputation SIMBA enjoys, he has refused to perform autopsies in a prompt and timely manner, thus straining SIMBA's relationship to the various coroners served, and he has repeatedly set a bad example for SIMBA employees by his repeated tardiness to work and early exits from the laboratory. Thus, his overall attitude is incompatible with the values vital to the well-being of SIMBA Laboratory and this partnership.

We, the remaining partners, therefore, are giving Dr. Fisher the sixty day (60) written notice of expulsion required by our contract with him."

On November 7, 1980, the three partners met to discuss the notice of expulsion. Notes of the meeting, admitted into evidence, demonstrate that Fisher denied most of the allegations against him and questioned the sources of information relied upon by Parks and Nuernberger.

Nuernberger and Parks testified that Fisher's conduct did not change during the ensuing months. Parks testified that on Sunday, November 16, 1980, Fisher was on call to perform two autopsies but could not be located. Parks was called to perform the autopsies on Monday, November 17. Parks also testified that on November 18, 1980, a tissue sample from a patient at Marshall Browning Hospital was lost. The hospital felt that Fisher was directly responsible as the tissue sample was under his care at the time it was lost. In a letter dated January 29, 1981, from David Hosler, the administrator of Marshall Browing Hospital, to Dr. Parks, Hosler stated:

"[A] tissue was lost that required a second operation for the patient involved. This incident caused everyone involved a great deal of discomfort and could have involved all of us in litigation. We feel Dr. Fisher was directly responsible for this problem, as he was in charge at your lab when the incident occurred."

On January 6, 1981, Parks and Nuernberger hand-delivered a letter to Fisher which provided:

"In accordance with our partnership agreement following a 60 day probation period after written notice of expulsion we are giving our notice in writing of our final decision in regard to previous notice of expulsion and will expect that your partnership will terminate Friday, March 6, 1981."

Plaintiff argues on appeal that the procedural requirements for partner expulsion were not complied with. The partnership agreement provides in pertinent part:

"This agreement is entered into on the 1st day of July 1978, by and between Harry W. Parks, M.D. Steven P. Nuernberger, M.D. and Jeffrey A. Fisher, M.D. *** and [they] agree to operate this partnership pursuant to the Uniform Partnership Act of the State of Illinois on the following terms and conditions:

* * *

### III. Duration of Partnership

The partnership shall commence operation on July 15, 1978 and shall continue until dissolved pursuant to the provisions of Article XIV of this agreement.

* * *

### VI. Rights, Duties, and Liabilities of Partners

A. Each of the partners shall devote his full time and efforts to the business of the partnership and none of the partners shall practice medicine or pathology in any name other than that of the partnership. Each partner will work to maintain a harmonious relationship with all patients, clients, laboratory staff and all medical staffs in client institutions.

***

C. *Vacations and leaves of absence.* Each partner shall be entitled to be absent on vacation without loss of compensation *** and such vacation shall be at such time, and for such length of time as may be mutually agreed upon and as may be convenient and feasible in carrying on said practice ***.

* * *

### VII. Management of Business

A. *Participation in management.* All of the partners shall have equal rights in the management of the affairs and business of the partnership. The decision by a majority in number of the partners shall be required as to the partnership affairs and business (unless a greater number is required pursuant to specific paragraphs of this agreement) and once obtained shall be binding on all partners.

* * *

E. *Meetings of Partners.* Without call or notice, the partners shall hold quarterly meetings at times [and] places to be selected by the partners. In addition special meetings may be called by any partner after giving two (2) days notice to all partners.

\* \* \*

### XIII. Expulsion of a Partner

A. *Grounds for Expulsion.* Any individual partner or partner in a partnership who is a party to this agreement[ ] may be expelled from membership in this partnership or his partnership as herein provided. Each partner shall have one vote.

The grounds for expulsion shall be as follows:

(1) Failure of a partner to make when due any contribution required to be made under the terms of this agreement, when such failure is continued to sixty (60) days after written notice of the failure to make contribution.

(2) Adjudication of the partner to be insane or incompetent.

(3) Disability of an individual partner to the extent that he is unable to fulfill his obligation to the partnership as specified in this Agreement in Article XII.

(4) The making of an assignment for the benefit of creditors \* \* \*.

(5) The failure of the partner to fulfill any other obligations, including the management obligations, as specified in this agreement when such failure is continued for a period of 60 days after written notice thereof.

(6) Conviction of a crime involving moral turpitude, homicide, [or] felonious theft \* \* \*.

(7) Loss of a license necessary to perform the work contemplated under this agreement.

B. *Notice.* Upon the occurrence of any event listed in section A of [this] Article, the defaulting partner may be expelled from membership in the partnership by a majority vote, said votes to be apportioned as provided in this Article. The defaulting party shall receive sixty (60) days notice of expulsion, such notice setting forth the grounds for expulsion and being delivered, in writing, by registered or certified mail. Any tie vote shall be referred to arbitration."

■ We note that the partnership agreement expressly provides that it is governed by the Illinois Uniform Partnership Act (Act) (805 ILCS 205/1 *et seq.* (West 1992)). Section 31(1)(d) of the Act provides that dissolution of the partnership is caused "[w]ithout violation of the agreement between the partners \* \* \* *[b]y the expulsion of any partner* from the business bona fide *in accordance with* such a power conferred by *the agreement between the partners.*" (Emphasis added.) (805 ILCS 205/31(1)(d) (West 1992).) Thus, a partnership is controlled by the terms of the agreement under which it is formed. (*In re Estate*

*of Johnson* (1984), 129 Ill. App. 3d 22, 472 N.E.2d 72.) Because a partnership is a contractual relationship, the principles of contract law fully apply to it. (*Allen v. Amber Manor Apartments Partnership* (1981), 95 Ill. App. 3d 541, 549, 420 N.E.2d 440, 446.) A contract's meaning is determined from the words or language used, and a court cannot place a construction on a contract which is contrary to the plain and obvious meaning of the language. *Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287, 458 N.E.2d 480, 481; *Gordon v. Bauer* (1988), 177 Ill. App. 3d 1073, 1088, 532 N.E.2d 855, 864.

According to the partnership agreement, in order to expel Fisher the other partners had to first provide Fisher with written notice of Fisher's failure to fulfill obligations. (See article XIII, section (A)(5), of the partnership agreement.) Because we agree that the November 5, 1980, letter fulfilled the notice provision, we decline to address plaintiff's contention that the March 27, 1980, letter was insufficient notice under the partnership agreement.

Sections (A) and (B) of article XIII each contain a notice provision. The initial notice described in article XIII, section (A)(5), is a threshold requirement for commencing the expulsion procedures. This notice must be in writing and advise the subject partner of his failures. It commences a 60-day period wherein the partner may attempt to cure his deficiencies. The second notice, that described in article XIII, section (B), which is also required to be in writing, advises the subject partner what the grounds for expulsion are. This expulsion notice must be given 60 days prior to the date of expulsion. Expulsion can only be by majority vote after a finding that the occurrence of the event listed in the initial notice has occurred.

Plaintiff contends that the November 5, 1980, notice of expulsion was not issued in compliance with the partnership agreement because it was never discussed at a meeting of all the partners, it was never the subject of a partnership vote, and it did not provide for a 60-day probationary period. As to the charge that the expulsion notice was never discussed prior to issuance, plaintiff charges that Parks and Nuernberger met secretly on November 5, unlawfully depriving plaintiff of his right to respond to allegations of his deficient performance. In support of his argument, plaintiff cites article VII, section (E), of the partnership agreement for the provision that the partners must be given two days' written notice of special meetings:

"Without call or notice, the partners shall hold quarterly meetings at times [and] places to be selected by the partners. In addition special meetings may be called by any partner after giv-

ing two (2) days notice to all partners." (Article VII, section (E), of the partnership agreement.)

Defendants argue that there is no provision in the contract for a meeting to discuss the preparation of written notice of partnership failure or for the issuance of a notice of expulsion. We agree.

A court should construe a contract in accordance with its plain and ordinary meaning. (*Johnstowne*, 99 Ill. 2d at 287, 458 N.E.2d at 481.) The special-meetings provision of the contract is found in article VII, which is entitled "Management of Business." Article VII, section (E), provides that quarterly meetings *shall* be held, and that special meetings *may* be called by any partner. There is no mandate that special meetings must be called. "May be called by any partner" indicates that a special meeting is subject to the partners' discretion. (See *In re Muro* (1980), 81 Ill. App. 3d 21, 23, 400 N.E.2d 1042, 1044.) More specifically, the partnership agreement does not specify in article XIII, entitled "Expulsion of a Partner," that a special meeting must be called to discuss the preparation of a notice of a partner's deficiencies or of an initial notice of expulsion.

Plaintiff also maintains that a vote of all partners was required before a notice under article XIII, section (A)(5), could be issued. The partnership agreement does not specify that the notice described in article XIII, section (A)(5), is subject to a vote or that it need be prepared or served with the same formality as an expulsion notice. Although a vote of all partners was not required, Nuernberger and Parks testified that they voted to send Fisher the notice.

As for plaintiff's contention that the notice did not advise him of a 60-day probationary period, once again we look to the plain and ordinary meaning of the contract. The partnership agreement specifies that a partner may be expelled when his failure to fulfill obligations "is continued for a period of 60 days after written notice thereof." Article XIII, section (A)(5), does not mandate that the notice advise him of a 60-day probationary period. The 60-day notice of expulsion provision is found at article XIII, section (B). Plaintiff does not dispute that he is familiar with the partnership agreement and that he received the November 5, 1980, letter advising him of alleged deficiencies in his performance. We cannot find that the trial court erred in finding that the November 5 letter was satisfactory notice under the contract.

Plaintiff also alleges that the letter of January 6, 1981, was not in compliance with the partnership agreement. Plaintiff argues that he received no notice of a meeting to discuss issuance of the January 6

letter, that there was no notice of a vote, and that, in fact, no partnership vote was taken.

It is undisputed that the January 6, 1981, letter falls under article XIII, section (B), of the contract, which requires the defaulting partner to be expelled by a majority of the partners, with each partner having one vote. The notice of expulsion must be delivered, in writing, by registered or certified mail; set forth the grounds for expulsion; and give the subject partner 60 days' notice of the date of expulsion. It is clear that the contract's expulsion provision does not require that a meeting be held or even that a formal partnership vote be taken. A vote of the majority of the partnership members is required to expel. The evidence demonstrates that Parks and Nuernberger voted to expel Fisher; thus, the voting requirement was satisfied.

Plaintiff's final attack on the January 6, 1981, notice is that it failed to set forth the grounds for expulsion. The January 6 letter provided in part: "we are giving our notice in writing of our final decision *in regard to previous notice of expulsion.*" (Emphasis added.) Although the notice does not expressly enumerate the grounds as set forth in the November 5 notice, the November 5 notice is specifically referred to and incorporated therein. We find that just as a contract may incorporate all or part of another document by reference (*Arneson v. Board of Trustees* (1991), 210 Ill. App. 3d 844, 849; 569 N.E.2d 252, 256), the January 6 letter incorporated the letter of November 5 by reference. We conclude that the trial court's determination that the letter of January 6, 1981, was sufficient notice under the partnership agreement was not against the manifest weight of the evidence.

■ The second issue on appeal is whether the trial court erred in finding that Fisher failed to meet his obligations under the partnership agreement. Plaintiff argues that he did not fail any management obligations during the probationary period from November 5, 1980, through January 6, 1981. Plaintiff contends there were only two purported failures which could remotely be identified as having occurred during the probationary period: the lost-specimen incident of November 17, 1980, and the failure to perform a Sunday autopsy on November 18, 1980. Plaintiff contends that these two incidents are inapplicable to establishing his failure to meet management obligations cited in the November 5, 1980, notice. On the contrary, it is evident that the two alleged incidents occurred during the probationary period and are directly related to Fisher's failure to fulfill his obligations and duties as a partner under the terms of the partnership agreement. In addition, the notice of November 5, 1980, specifically referred to Fisher's

failure to perform autopsies in a prompt and timely manner and his failure to fulfill his obligations and duties as a partner in general. Once again we turn to the testimony rendered at trial.

Nuernberger and Parks testified that after November 5, 1980, Fisher did not give them any reason to believe he intended to change his unsatisfactory behavior. Fisher continued to jog while at the SIMBA laboratory after November 5, 1980, pursuant to testimony by Mary Cruzvergara and Arna Trotter. Ruth Lafferty, a pathology secretary for Alton Memorial Hospital, testified that Fisher jogged nearly every time he came to the hospital and that his disinterested attitude in his work never changed. Nancy Powles, a medical technologist at St. Joseph's Hospital, also testified that Fisher jogged more than half the time that he visited St. Joseph's Hospital and that his habit of jogging there never changed. Jo Ellen Heggemeier, a medical technologist at Sparta Community Hospital, also testified that Fisher jogged when he was supposed to be on duty at the hospital and that this habit did not change. All of these witnesses testified that Fisher's habit of jogging interfered with his work. In addition, Cruzvergara and Trotter testified that Fisher's habit of keeping minimal hours at the SIMBA laboratory never changed.

Jeffrey Fisher testified he never did anything contrary to the terms of the partnership agreement and that he had an explanation for each instance in which he was accused of not doing an autopsy promptly or otherwise fulfilling his duties. He testified that he never compromised his professional duties in order to jog and that he normally took 45 minutes during his lunch hour to jog. Fisher testified that if witnesses testified that he did not regularly spend seven to eight hours a day at SIMBA laboratory, they were mistaken.

Where a case is heard by a court sitting without a jury, unless the trial court's findings are against the manifest weight of the evidence or there is some other palpable error, the findings will not be disturbed on appeal. The trial court is in a better position than is a court of review to decide what weight should be given the testimony. (*Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 371, 247 N.E.2d 894, 897; *Pasulka v. Koob* (1988), 170 Ill. App. 3d 191, 524 N.E.2d 1227.) Based on the record, we conclude that the trial court's determination that Fisher failed his management obligations during the period from November 5, 1980, through January 6, 1981, is not against the manifest weight of the evidence.

■ The final issue for our consideration is whether the court erred in awarding the plaintiff $276.15 as his interest in the partnership. Plaintiff contends that under the terms of the partnership agree-

ment he is entitled to $343,357. The pertinent provisions of the partnership agreement are as follows:

## "IV. CAPITAL CONTRIBUTIONS AND FIDUCIARY
## INTEREST OF EACH PARTNER

The capital of the partnership as of this date consists of a value of $80,329.83. In the prior partnership agreement, Nuernberger agreed to pay Parks the amount of $30,043.20 under a formula determined in paragraph IV of said prior partnership agreement and this amount was to be paid in twenty-four (24) equal monthly installments of 1/24th of the total. This obligation of Nuernberger to Parks is renewed. Fisher agrees to pay Nuernberger and Parks the sum of $26,776.61 to acquire a one-third (1/3) interest in SIMBA and payments [*sic*].

\* \* \*

## IX. ACCOUNTING MATTERS

A. *Books of Account.* Books of account shall be kept by the partners, and proper entries made therein of all the sales, purchases, receipts, payments, engagements, transactions, and property of the partnership.

B. *Method of Accounting.* All accounts of the partnership shall be kept on the cash basis. All matters of accounting for which there is no provision in this agreement are to be governed by generally accepted methods of accounting.

\* \* \*

E. *Capital accounts.* A capital account shall be maintained on the partnership books on behalf of each partner. Such account shall be credited with that partner's contributions to the capital of the partnership and shall be debited and credited in the manner prescribed in subsection (f) of this article.

\* \* \*

## XI. DEATH, INCOMPETENCY, DISSOLUTION, ETC.
## OF A PARTNER

A. The death, adjudication in bankruptcy, retirement, insanity, incompetency, dissolution, withdrawal or expulsion of a partner shall not terminate the partnership.

B. In the event of any occurrence as stated in (A) of an individual partner, the remaining partners shall immediately be vested with the deceased \*\*\* or expelled partner's interest, subject however to the payment to the \*\*\* partner, of his share or interest in the partnership as and in the manner hereinafter set forth. \*\*\* [A] current statement of the partnership's net asset value shall be made by the partnership's account and the re-

tired, withdrawing or expelled partner *** shall be paid as provided in this agreement[:]

(1) For a deceased, retired, insane or incompetent or disabled partner, the greater of:

(a) The partner's capital account as of the end of the prior fiscal year preceding the event involved herein, plus the partner's share of receivables x 85% or the average of the net income (after salaries and expenses and before profit or additional income withdrawals) of the highest three year [sic] of the previous five years [or] if the partnership has not been in operation for five years the average of the years of operation, capitalized by a multiple of four (4) times said partner's percentage interest in the partnership.

(b) In addition to the amount determined in A 1 (a) the partner or the person so entitled shall also receive his shares in the profits of the partnership, if any, to the date of the event herein involved.

(c) The sum as determined in A 1 (a) and (b) shall be decreased by the partner's share of the partnership losses, if any, computed from the beginning of the partnership's taxable year in which the event herein involved took place to the last day of the month preceding such event and shall be decreased or adjusted for any and all contributions and withdrawals made by that partner and for any debts owed to the partnership.

\* \* \*

(2) For a bankrupt or expelled partner, his interest shall be paid in like manner as provided in this Article except that he or the trustee in bankruptcy, as the case may be, shall receive an amount equal to the capital account of the bankrupt or expelled partner adjusted to the end of the nearest month prior to the event herein involved as adjusted as provided in A(1)(b) and (c)."

What is significant about these provisions of article XI is that section (B)(2) refers to sections "A(1)(b) and (c)," which are nonexistent. This problem is further compounded if we assume that the reference in section (B)(2) was intended as "B(1)(b) and (c)," because, any intent to limit section (B)(2) to sections (B)(1)(b) and (c) is thwarted where section (B)(1)(b) refers specifically to "A(1)(a)," which is also nonexistent.

Defendants' accountant, Earl Swink, testified that in calculating the amount due Jeffrey Fisher, he based his findings on the assumption that the reference in section (B)(2) to "A(1)(b) and (c)" refers to sections (B)(1)(b) and (c). Swink further testified that in the case of an

expelled partner, as we have here, adjustments as set forth in section (B)(1)(a) are not to be considered in determining amounts due the expelled partner, as it is obvious from the agreement that expelled partners are to be treated differently from those who are deceased, retired, insane, incompetent, or disabled. Swink testified that, applying the formula set forth in section (B)(1)(b) and (c), Fisher is entitled to $276.15.

Michael Hagenhoff, Fisher's accountant, testified that one cannot ignore the application of section (B)(1)(a) if sections (B)(1)(b) and (c) are utilized. He testified that if one calculates Fisher's interest in the partnership by assuming that section (B)(1)(a) applies, Fisher's interest in the partnership is valued at $343,357. The parties dispute which of the two methods of calculation is appropriate under the partnership agreement.

It is well settled that a party asserting a fact or issue generally has the burden of proof as to such fact or issue. (*In re Marriage of Douglas* (1990), 195 Ill. App. 3d 1053, 1060, 552 N.E.2d 1346, 1351.) Plaintiff, as the party claiming an interest under the partnership agreement, had the burden of going forward with evidence to support his construction of the agreement. The term "burden of proof" includes both the burden of producing evidence and the burden of persuading the trier of fact. (*People v. Ziltz* (1983), 98 Ill. 2d 38, 43, 455 N.E.2d 70, 72.) There is no question that the partnership provisions concerning the capital contributions and fiduciary interests of the partners are unclear. Plaintiff produced no testimony as to what the parties intended when they entered into the partnership agreement. Michael Hagenhoff testified extensively as to calculations using sections (B)(1)(a), (b), and (c); however, he did not offer proof as to why this formula was more appropriate than the formula adopted by defendants' accountant, Earl Swink.

Earl Swink testified that in previous years he has prepared, or assisted in preparing, many of the partnership's income tax returns and has assisted SIMBA in general tax matters. He testified that in January of 1981 he met with Parks, Nuernberger, and SIMBA's attorney to determine the financial obligations between the partners. Swink testified that it was agreed that under the expulsion clause of the partnership agreement Fisher was entitled to his capital account, $6,908, plus or minus any amounts otherwise owing to him or to the partnership.

It is a fundamental principle of contract construction that where an agreement is indefinite, the courts will look to and adopt the interpretation which the parties themselves have placed on it. (*Pocius v.*

*Halvorsen* (1963), 30 Ill. 2d 73, 81, 195 N.E.2d 137, 141; *Burgener v. Gain* (1981), 101 Ill. App. 3d 699, 704, 428 N.E.2d 722, 727.) In this case, the parties' interpretation of the contract provisions regarding capital contributions and fiduciary interests came from Hagenhoff and Swink. For the most part, the witnesses' opinions as to the interpretation of the contract were couched in terms of their own personal beliefs. Swink, however, testified that he had handled SIMBA's accounting matters for years and that it was the opinion of Parks and Nuernberger that the expulsion provision of the contract governed, excluding section (B)(1)(a) from the calculation of Fisher's entitlement. Contrary to plaintiff's conclusion, a review of the testimony at trial supports the trial court's finding that the intent of the parties was to apply the contract's sections (B)(1)(b) and (c) and not section (B)(1)(a) in determining the amount due Fisher.

Fisher also argues that Swink's calculations are erroneous because they assume the partnership tax return's description of the capital account supplants the actual value as determined in the partnership agreement. Fisher further argues that Swink erroneously deducted interpartner obligations in his calculations, thus reducing Fisher's capital account. Defendants maintain that to adopt Fisher's arguments one has to ignore the definitions of capital account and earnings of income as they appear in the partnership agreement. Defendants also maintain that Fisher refuses to consider the difference created by the partnership agreement for expelled partners and nonexpelled partners. Having reviewed the testimony of the witnesses, and the exhibits to which they refer, we cannot find that the trial court erred in finding that Swink's calculations were proper.

The judgment of the circuit court of Madison County is, therefore, affirmed.

Affirmed.

LEWIS and GOLDENHERSH, JJ., concur.