WINSTON AND STRAWN, Plaintiff and Counterdefendant-Appellee, v. CHESTER W. NOSAL, Defendant and Counterplaintiff-Appellant.

First District (4th Division)    No. 1—95—0819

Opinion filed March 29, 1996.

232

Foran & Schultz, of Chicago (Thomas A. Foran and Maria B. Wilneff, of counsel), for appellant.

Rothchild, Barry & Meyers, of Chicago (Norman J. Barry and Alan S. Madans, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

This case arose from the expulsion of the defendant-counterplaintiff, Chester W. Nosal, from the partnership of the plaintiff-counterdefendant, Winston and Strawn (hereinafter Winston or the firm). Winston filed suit seeking a declaration that Nosal's expulsion was effectuated validly under the partnership agreement and that it did not result in a dissolution of the partnership. Nosal counterclaimed for, *inter alia*, a declaration that his expulsion was invalid under the partnership agreement and that it operated to dissolve the partnership (count I).[1] The trial court granted summary judgment in favor of Winston on both its complaint and count I of Nosal's counterclaim. Nosal now appeals under Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)), contending that his expulsion (1) was effectuated under an invalidly enacted partnership agreement; (2) was void as a breach of the partners' fiduciary duties to one another; and (3) operated to dissolve the partnership.

Winston is a large general practice law firm headquartered in Chicago. Since 1978, it has had a two-tiered partnership structure consisting of capital partners, who are compensated based upon a percentage of the firm's profits, and noncapital "income" partners, who are salaried.

---

[1]Count II of Nosal's counterclaim sought an accounting from the partnership. That claim remains pending in the circuit court and is not at issue in this appeal.

Nosal began as an associate with Winston in 1970, was promoted to a noncapital partner in 1977, and became a capital partner in 1984. His practice specialized in taxation and international law, and in 1982, he moved to the firm's branch office in the District of Columbia to assist in the international practice and office management there.

In March 1992, about 19 of Winston's partners received written notice from the firm's then-managing partner, Gary Fairchild, that they were being "outplaced," or discharged, from the firm, essentially for economic reasons. On April 2, 1992, Nosal received the same notice informing him of his own outplacement. One month later, when Nosal refused to leave the firm, 55 of 71 of the firm's capital partners voted to expel him from the partnership. Shortly thereafter, Nosal brought suit against Winston in the superior court of the District of Columbia, seeking declaratory relief and damages resulting from the expulsion. Winston then filed the instant action requesting a declaration that (1) its partnership agreement effective August 28, 1987 (1987 agreement), including the provision authorizing Nosal's expulsion, was properly enacted by the firm; (2) Nosal's expulsion was in accordance with the 1987 agreement; and (3) the expulsion did not cause a liquidation of the partnership. Nosal's District of Columbia suit was dismissed based on *forum non conveniens*, and he then filed a counterclaim in the instant case. Count I of the counterclaim alleged that the expulsion provision in the 1987 agreement had never been validly adopted by the firm and that his expulsion breached the partners' fiduciary duty to him. Nosal requested a declaration that his expulsion resulted in a dissolution of the partnership.

Winston moved for summary judgment on its complaint and on count I of Nosal's counterclaim, supporting its motion in part by the depositions of partners Fairchild, Thomas A. Reynolds, and J. Michael McGarry III. Nosal's response was supported primarily by his own deposition testimony and affidavit, and the deposition testimony of Winston partner Gary Goodman and former Winston partner Richard William Austin. Following a hearing, the trial court granted summary judgment in favor of Winston on both its complaint and on count I of Nosal's counterclaim. The court found that the 1987 partnership agreement was validly adopted, that Nosal's expulsion complied with the agreement, and that it did not contravene any duty of good faith. The court also determined based upon the 1987 partnership agreement that Nosal's expulsion did not effect a dissolution of the partnership.

On appeal, Nosal first argues that his expulsion was invalid because it was done under the 1987 partnership agreement, which

was never properly adopted by the firm. Nosal maintains that the firm was still bound under the agreement as effective July 1, 1984 (1984 agreement), and that his expulsion was carried out in violation of that agreement's voting requirement.

Winston made several amendments to its partnership agreement over the years. Under the 1984 agreement, the firm was managed by the capital partners generally. All firm activity required approval by a simple majority of the capital partners, with several exceptions; one exception was for the expulsion of a partner, which necessitated a majority vote of all partners, but with the votes of capital partners entitled to greater weight than those of noncapital partners. Another exception was that any amendment to the agreement's partner-expulsion provision could only be accomplished by a two-thirds majority of all capital partners plus a majority vote of all noncapital partners. The agreement did not provide for "cause" or a hearing prior to the discharge of a partner. Finally, the 1984 agreement stated that all partners were to be permitted access to partnership books and records.

The 1987 agreement contained several changes from the 1984 agreement. Among them was the creation of an executive committee that was to have primary governing responsibility over the firm, including setting attorney compensation. The committee was to be comprised of nine capital partners, including Fairchild and Reynolds. Additionally, while most firm activity still required a majority vote by the capital partners, the partner-expulsion provision now required merely a two-thirds majority of the capital partners with no additional vote of noncapital partners. As with the 1984 agreement, the discharge of a partner required no showing of cause. Finally, the agreement provided that the "withdrawal, expulsion or death of any partner" would not terminate the partnership or the partnership accounting period.

On appeal, Nosal does not dispute that his expulsion was approved by 55 of 71 capital partners, well over the two-thirds majority required for expulsion under the 1987 agreement. However, he maintains that the firm never validly adopted the 1987 agreement and was still bound under the 1984 procedure, which required a vote of both capital and noncapital partners prior to expulsion; thus, he maintains his expulsion was invalid because it was never put to a vote of the noncapital partners. In response, Winston contends that the 1987 provision was validly enacted, but that even if it was not, there were sufficient votes to terminate Nosal even under the 1984 agreement.

Summary judgment is appropriate where the pleadings, deposi-

tions, and admissions, together with any affidavits, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1992); *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). In considering a summary judgment motion, the court's function is simply to determine whether a factual controversy exists and, if not, whether the movant is entitled to judgment as a matter of law; the court must not resolve any disputed factual matters or make any credibility determinations. *Hansen v. Demarakis*, 259 Ill. App. 3d 166, 168, 630 N.E.2d 1202 (1994). The party opposing the motion need not conclusively disprove the facts presented by the movant, but must merely show that a contrary version of events exists, thereby creating a disputed issue for trial. *Yusuf v. Village of Villa Park*, 120 Ill. App. 3d 533, 540-41, 458 N.E.2d 575 (1983). This court's review of an order granting summary judgment is *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992).

We note initially that in ruling on this issue, the trial court accepted certain of Winston's evidence as "veritable" and "credible." These are factual determinations clearly inappropriate on a motion for summary judgment. See *Hansen*, 259 Ill. App. 3d 166, 630 N.E.2d 1202.

Although there is no question that the requisite number of votes existed to expel Nosal under the 1987 agreement, the parties do conflict over whether that agreement was validly enacted. However, this does not constitute a material factual issue in this case, because the expulsion was sufficiently effectuated under the 1984 agreement. That agreement stated as follows:

> "In voting [to expel a partner], 75% of the total votes shall be cast by the Capital Partners, each of whom shall have an equal proportion of such percentage[,] and 25% of the total votes shall be cast by the non-capital partners, each of whom shall have an equal proportion of such latter percentage. A majority of the total votes eligible to be cast shall be required."

Although the noncapital partners undisputedly did not participate in the expulsion vote, it is clear that 55 out of 71 capital partners, or 76% of the total capital partners, voted in favor of Nosal's expulsion. When 76% is multiplied by the 75% weight designated for these votes, the result is that a 57% majority of all votes eligible to be cast were in favor of expulsion. Thus, the necessary votes were obtained, and even if 100% of the noncapital partners had voted against expulsion, it would not have affected the outcome in Nosal's case.

Nosal argues that the agreement nonetheless expressly entitled him to a "vote of *all* partners" (emphasis added), and that the expulsion was thus void under section 18(h) of the Uniform Partnership Act (Act) (805 ILCS 205/18(h) (West 1992)). That section states that "no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners."

■ The Act states that the rights and duties of partners relative to the partnership are governed by the provisions of the Act, subject to any agreement between them. 805 ILCS 205/18 (West 1992); *Seymour v. Williams*, 249 Ill. App. 3d 264, 270, 618 N.E.2d 966 (1993). Further, in interpreting such agreements, ordinary contract principles apply (*Fisher v. Parks*, 248 Ill. App. 3d 666, 675, 618 N.E.2d 1202 (1993)), and even where a technical breach has occurred, a partner may not maintain an action thereon unless he can show he was damaged from the breach. *American Garden Homes, Inc. v. Gelbart Fur Dressing*, 238 Ill. App. 3d 64, 71, 606 N.E.2d 106 (1992).

■ In light of the overwhelming vote of the capital partners in favor of Nosal's expulsion, the failure to submit the matter to a further vote by the noncapital partners did not substantially compromise Nosal's rights under the 1984 agreement. As with the 1987 agreement, there was no provision calling for a hearing, formal meeting, or "just cause" showing prior to expulsion. Nor was there any mandate that the noncapital partners vote in conjunction with the capital partners. Given these circumstances, an additional vote by the noncapital partners in Nosal's case would have been merely superfluous, and its omission did not amount to an act "in contravention" of the agreement. Accordingly, the expulsion was in conformance with the procedural requirements of both the 1984 and 1987 agreements.

Nosal next contends that his expulsion was void because it was in violation of the implicit duty of good faith that exists between partners. Nosal maintains that he was expelled solely because of his persistent requests to inspect the firm's books and records, which he contends would have revealed secretive self-dealing on the part of the executive committee and fraudulent conduct by Fairchild. Winston disputes these reasons and contends that Nosal's expulsion was proper because it was approved by the requisite votes.

From 1988 until his outplacement, Nosal made repeated requests through Fairchild to view the firm's financial statements, point allocation and project compensation figures, executive committee meeting minutes, and partnership compensation records. Nosal invoked a provision in the partnership agreement entitling all partners to "access to the firm's books and records." Nosal's affidavit in response to

Winston's summary judgment motion indicates that Fairchild initially used dilatory tactics, occasionally promising some records; however, there is no dispute that apart from producing the firm's audited financial statements, Fairchild ultimately refused to cooperate with Nosal's requests. This fact was corroborated by the deposition of Austin, who was also seeking and being denied information regarding partner compensation during this period.

Nosal averred that in March 1991, he sent Fairchild a memorandum voicing his dissatisfaction with being refused access to the requested books and records over the prior three years. In May 1991, Nosal made a written request for the records to Loren Wittner, a partner in charge of marketing. Fairchild produced the audited financial statements two months later and then informed Nosal that no further documents would be provided and that such denial was in accordance with the partnership agreement and with the wishes of the executive committee.

In August 1991, the capital partners considered a proposal by the executive committee to amend the partnership agreement to retain the existing executive committee members and appoint several additions. Nosal responded with a memorandum to the capital partners disagreeing with the proposed amendment and urging that it not be passed in light of Fairchild's continuing refusal to provide any information regarding the firm's management or partner compensation structure. Despite Nosal's efforts, the partners passed the amendment.

On September 23, 1991, Nosal again requested firm books, and Fairchild responded with correspondence requesting a meeting with Nosal to discuss his "overall displeasure with the firm," stating that "[w]e are not moving along parallel paths."

In fall of 1991, Fairchild circulated a proposed revised partnership agreement to the partners. Nosal provided Fairchild with comments on the proposed agreement, stating that the 1987 agreement had never been properly adopted and was thus open to challenge, along with the creation and status of the executive committee. Nosal also urged that in order to avert potential challenge to the new agreement, there be an accounting and "full disclosure" by the executive committee for the preceding four year period. Additionally, Nosal denounced as "unacceptable" the "almost unlimited" authority of the executive committee, along with the current compensation schedule.

In late 1991, Fairchild raised the issue of "partner outplacement" before the executive committee. In a meeting of capital partners, Fairchild indicated that there would be "modest re-sizing" to position

the firm to "meet the new demands of the 1990's marketplace." On March 23, 1992, approximately 19 partners received a form notice that they were being outplaced by the firm in order to "ensure the firm's continued strength and profitability." Nosal was not given such notice, nor did he appear on the list of partners included in the outplacement action. The record indicates that during this period, Nosal was assured by District of Columbia partner McGarry that he was not a candidate for outplacement. A memorandum from McGarry to Fairchild also stated that Nosal's recent contribution to the firm had exceeded projections and recommended that he be given an increase in ownership "points." Nosal averred that he received notice from Fairchild about this time period informing him of his increased compensation.

On March 24, 1992, at a partnership meeting to discuss the outplacement, Nosal distributed a memorandum to the partners expressing his dissatisfaction with the executive committee's decision to expel partners, stating that it was in violation of the partnership agreement, and indicating that, before he would endorse such action, he would require an accounting and disclosure of all financial records regarding the partnership from 1987 to date.

In March 1992, Nosal made a final request for partnership information and then presented Fairchild with a draft complaint seeking enforcement of his right to inspect partnership records, for an accounting, for damages for breach of fiduciary duty, and for a declaratory judgment as to the partnership agreement. Fairchild tore up the pleading.

On April 2, 1992, Nosal received the form memorandum informing him that he was to be outplaced. According to Austin's deposition, Nosal's outplacement occurred within days of a meeting in which Fairchild and McGarry attempted to resolve Nosal's continual requests for information. According to the depositions of Fairchild, McGarry and Goodman, Nosal was outplaced because his interest in building a two-pronged tax and international trade practice was incompatible with the interests and resources of the firm, and because he had engaged in "disturbing" conduct. On May 6, 1992, the capital partners voted to expel Nosal from the firm.

■ It is well established that a fiduciary relationship exists between partners and that each partner is bound to exercise the utmost good faith and honesty in all matters relating to the partnership business. *Couri v. Couri*, 95 Ill. 2d 91, 98, 447 N.E.2d 334 (1983); *Bakalis v. Bressler*, 1 Ill. 2d 72, 79, 115 N.E.2d 323 (1953); *Labovitz v. Dolan*, 189 Ill. App. 3d 403, 545 N.E.2d 304 (1989). This duty prohibits all forms of secret dealings and self-preference in any matter "relat-

ing to and connected with a partnership" (*Bakalis*, 1 Ill. 2d at 79; see also *Labovitz*, 189 Ill. App. 3d at 412) and requires each partner to fully disclose partnership business to other partners. *Borys v. Rudd*, 207 Ill. App. 3d 610, 620, 566 N.E.2d 310 (1990).

■ Illinois has yet to address the extent of the duty of good faith in the context of partner outplacement or expulsion. Courts in other jurisdictions, however, have concluded that partners owe one another a duty of good faith in the context of expulsion, even where the partnership agreement permits expulsion without cause. *Bohatch v. Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App. 1995); see, *e.g.*, *Leigh v. Crescent Square, Ltd.*, 80 Ohio App. 3d 231, 608 N.E.2d 1166 (1992); *Levy v. Nassau Queens Medical Group*, 102 A.D.2d 845, 476 N.Y.S.2d 613 (1984). This duty derives from the broader requirement that partners always exercise good faith in their dealings with other partners (*Holman v. Coie*, 11 Wash. App. 195, 207, 522 P.2d 515, 523 (1974)), and that they not derive any clandestine profit or advantage from the partnership arrangement without the full knowledge of the other partners. *Leigh*, 80 Ohio App. 3d at 237, 608 N.E.2d at 1170, citing *Latta v. Kilbourn*, 150 U.S. 524, 541, 37 L. Ed. 1169, 1175, 14 S. Ct. 201, 207 (1893); see also *Holman*, 11 Wash. App. 195, 522 P.2d 515.

In this case, there is no dispute that the partnership agreement places no restriction upon the expulsion of a partner other than approval by the requisite majority. However, the agreement also grants all partners unrestricted access "to the books and records of the partnership." Access to partnership books is also guaranteed under section 19 of the Act. 805 ILCS 205/19 (West 1992).

Nosal claims that the documents he sought would have revealed the executive committee's plan to retain much of the firm's wealth and management power in the hands of its members. Specifically, the documents would have proven that upon assuming control, and without generally notifying the remaining capital partners, the executive committee dramatically increased the total number of partnership "points," or portions of ownership interest in the firm, and then awarded themselves large increases.

Indeed, the record substantiates that in 1990, the executive committee voted its members considerable increases in individual points which were not given to the remaining capital partners. Nosal's evidence indicates that other capital partners were never notified about this action, and that when Nosal and Austin sought to learn about it, they were repeatedly denied documents expressly guaranteed them under the partnership agreement. We recognize Fairchild's testimony that the executive committee had the prerogative to designate the

number of points for each capital partner; however, we find nothing in the agreement permitting such self-promoting action as was taken here without the full awareness of the remaining capital partners.

Nosal also alleges that Fairchild intentionally kept such data from him because Nosal could have uncovered evidence of Fairchild's ongoing fraudulent billing scheme subsequently discovered by the firm.

■ On review from the grant of summary judgment, we are required to construe all evidence and inferences strongly against the movant and liberally in favor of the nonmoving party. *Purtill*, 111 Ill. 2d at 240; *Lapidot v. Memorial Medical Center*, 144 Ill. App. 3d 141, 147, 494 N.E.2d 838 (1986). We note that among the documents sought by Nosal was a firm auditor's internal control report, which arguably could have disclosed questionable billing practices by Fairchild. It cannot be ignored that Nosal's outplacement immediately succeeded his ongoing requests for sensitive firm information and came just days after he presented Fairchild with a draft complaint threatening to sue the firm to enforce his right to examine books and records. The evidence further indicates that it was Fairchild, in his discretion, who was largely instrumental in the sudden decision to outplace Nosal despite the fact that just a week before, Nosal was given a favorable review, a compensation increase, and assurances by McGarry that he was not among those to be outplaced.

Fairchild's steadfast refusal of Nosal's access to records, his role in the outplacement, and the fact that it occurred just after Nosal's threatened lawsuit raise an inference that Nosal was expelled solely because he persisted in invoking rights belonging to him under the partnership agreement and that the reasons advanced by the firm were pretextual. Regardless of the discretion conferred upon partners under a partnership agreement, this does not abrogate their high duty to exercise good faith and fair dealing in the execution of such discretion. *Labovitz*, 189 Ill. App. 3d at 412. Nosal has sufficiently raised a triable issue that his expulsion occurred in breach of this duty.

■ The trial court also granted summary judgment in favor of Winston on count I of Nosal's counterclaim, which sought a dissolution of the partnership due to Nosal's wrongful expulsion. We note that both the 1984 and 1987 agreements state that the "withdrawal, expulsion or death of any partner shall not terminate the partnership."

Although such an agreement between partners normally prevails (see *Saballus v. Timke*, 122 Ill. App. 3d 109, 116, 460 N.E.2d 755 (1983)), a wrongful exclusion or "freeze out" of one partner from

participation in the business will be grounds for judicial dissolution of the partnership. *Saballus*, 122 Ill. App. 3d at 118. In light of our reversal of summary judgment on the issue of Nosal's bad-faith outplacement and expulsion, we also reverse the court's determination on this issue. In the event Nosal prevails on his claim for bad-faith expulsion, this question should be reconsidered.

For the foregoing reasons, we enter a summary determination that there were sufficient votes to expel Nosal both under the 1984 and 1987 partnership agreements. 735 ILCS 5/2—1005(d) (West 1992). We reverse the allowance of summary judgment for Winston on the questions of Nosal's bad-faith expulsion and whether the expulsion operated to dissolve the partnership, and remand this matter for proceedings consistent with this opinion.

Reversed and remanded.

CAHILL and THEIS, JJ., concur.