LEIGH, Appellant,

v.

**CRESCENT SQUARE, LTD. et al., Appellees.**

[Cite as *Leigh v. Crescent Square, Ltd.* (1992), 80 Ohio App.3d 231.]

Court of Appeals of Ohio,
Montgomery County.

No. 12895.

Decided May 22, 1992.

*Gary W. Gottschlich,* for appellant.

*Eugene Robinson,* for appellee Crescent Square, Ltd.

*Richard M. Goehler,* for appellee The March Company.

BROGAN, Judge.

The appellant, Bernard C. Leigh, appeals from the judgment of the Montgomery County Court of Common Pleas denying his motion for partial

summary judgment and granting summary judgment for the appellees, Crescent Square, Ltd., et al.

This case involves a general partner of a limited partnership who claimed that he did not receive the required advance notice of the partnership's initiation of proceedings to remove him. The trial court found that the partnership agreement did not provide for such advance notice and granted summary judgment for the appellees. In this appeal, Leigh advances two assignments of error: (1) that the denial of his motion for partial summary judgment was in error, and (2) that the entry of summary judgment in the appellees' favor was in error.

The limited partnership was formed in 1982 when Lelia I. Francis ("Francis") combined resources with William Leigh to rehabilitate an apartment complex she owned. The Department of Housing and Urban Development ("HUD") helped fund the project. However, William Leigh was barred from participation in HUD activities, so he assigned his interest in the project to his son Bernard Leigh ("Leigh"). Leigh and Francis then formed a limited partnership known as Crescent Square, Ltd. ("Crescent"); Leigh and Francis were both general and limited partners.

On April 14, 1983, when sufficient limited partners had been procured, the partnership agreement was amended to include, *inter alia*, the new designations of Leigh and Francis as "developer general partners" and Paragraph 21, cited *infra*. The amendment also mentioned a group of investors which included The March Company, Inc. ("March"). Besides being a limited partner, March acted as a syndicator, obtaining several investors for the partnership. March was also responsible for facilitating communications between all the partners. The Fourth March Realty Company, a subsidiary of March, was also a limited partner. Another subsidiary, March Investor Services, was not a limited partner, but was included in the agreement between March and Crescent to provide investor services for the partnership for a fee. This first amended agreement was known as the FALPA.

Shortly thereafter, disagreements arose between Leigh and Francis; one of the disputes was resolved by this court in *Francis v. Leigh* (Oct. 10, 1985), Montgomery App. No. 8968, unreported, 1985 WL 9619. In *Francis*, we agreed with the trial court that the Leighs had engaged in tortious interference with Francis's rights as a general partner. *Id.* We also found that William Leigh had participated in the project in blatant disregard of his suspension by HUD by using his son as his alter ego. *Id.* Francis was awarded damages in the amount of $24,472.02.

Subsequent to this decision, Francis wrote to the executive vice president of March in October 1985, enclosing a copy of the October 10, 1985 opinion and

listing Leigh's expulsion as one of Crescent's objectives. The following month, Francis sent a letter to the senior vice president of March, requesting the company's assistance in canvassing the limited partners to obtain their consent to Leigh's removal. The letter listed specific instances of Leigh's misconduct. In September 1986, Francis and Crescent's accountant sent a letter to all the limited partners which included the ballots necessary to instigate Leigh's removal. The limited partners also received a project status report from March Investor Services in October 1986, which referenced the issue of Leigh's removal discussed in the September 1986 letter. On May 8, 1987, after the required majority of the limited partners had signed and returned their ballots effecting Leigh's removal, Leigh was notified of his expulsion.

On March 13, 1989, Leigh filed his complaint in the Montgomery County Court of Common Pleas for declaratory, equitable, and legal relief. Count I of the complaint, the claim for conversion, was voluntarily dismissed in June 1990. Crescent filed its answer on November 30, 1990. Leigh filed an amended complaint in July 1990. In July 1990, Leigh moved for partial summary judgment. Crescent and March also moved for summary judgment. On March 7, 1991, the trial court granted summary judgment for all the defendants; the entry was filed on April 30, 1991. On June 14, 1991, Leigh filed his notice of appeal.

Leigh advances two arguments in his first assignment of error. First, he asserts that the trial court erred in denying his motion for partial summary judgment because the FALPA unambiguously required that a general partner receive advance notice of removal proceedings being instituted against him. Secondly, Leigh argues that even without this contractual notice obligation, the general partners' fiduciary obligations of good faith and fair dealing required such notice. This latter argument is substantially similar to Leigh's second assignment of error and will be considered in conjunction therewith.

In support of his contractual basis for a notice requirement, Leigh relies on Paragraph 21 of the FALPA, which states that:

"Any Developer General Partner who is guilty of willful misconduct or gross negligence, or commits any breach of his or her fiduciary duties, material covenants or representations and warranties hereunder may be removed as General Partner with the written consent of a majority in interest of the Limited partners *upon written notice to the General Partner being removed.*" (Emphasis added.)

Generally, relations between partners are governed by the terms of the partnership agreement, provided such terms are not in conflict with a statute

or with public policy considerations. R.C. 1775.05(B); see, also, 2 Cavitch, Business Organizations with Tax Planning (1991), Section 39.08.

The trial court found that the plain language of Paragraph 21 rendered the ouster effective upon notice to the general partner being removed. Furthermore, because Leigh had not identified any due process requirements in the agreement, the trial court found that Crescent had acted properly and granted summary judgment in its favor.

Leigh contends that the trial court erred in holding that the FALPA "merely identifies notice as the trigger activating an already-consummated removal" because Paragraph 21 required advance notice to a partner being removed.

It is widely held that courts may not imply additional terms in a contract or agreement where none clearly exists. For instance:

" 'Expulsion provisions are rare because of each partner's fear that the others may gang up on him.' As a consequence, there is very little law on the subject of expulsion. There is, however, case law involving partnership agreements which substantiates the proposition that *additional requirements should not be added to unambiguous expulsion provisions.*" (Emphasis added.) *Holman v. Coie* (1974), 11 Wash.App. 195, 206, 522 P.2d 515, 522, citing Bromberg, Crane & Bromberg on Partnership (1968) 426, Section 74(d).

The court further stated that:

"The foundation of a professional relationship is personal confidence and trust. Once a schism develops, its magnitude may be exaggerated rightfully or wrongfully to the point of destroying harmonious accord. When such occurs, an expeditious severance is desirable. *To imply terms not expressed in [the] partnership agreement frustrates the unambiguous language of the agreement and the result contemplated.*" (Emphasis added.) *Id.* at 211, 522 P.2d at 524; accord *Waite on Behalf of Bretton Woods Acquisition Co. v. Sylvester* (1989), 131 N.H. 663, 560 A.2d 619.

■ The partnership agreement in question does not clearly provide for due process or notice procedures in case of expulsion. Absent explicit provisions in a partnership agreement requiring advance notice to a party being removed, we do not find that such notice is implicit in an expulsion provision. We will not imply or add additional terms to an agreement.

The lower court found that the language of Paragraph 21 served only to activate the ouster decision. In reading the paragraph in a light most favorable to Leigh, we find the language to be ambiguous at best. Specifically, the past tense of the word "being" could be construed to require advance notice, rather than simply activating the decision to ouster. Further, by

applying the rule that contractual language be interpreted according to its plain, ordinary meaning, the existence of the notice provision in and of itself could imply a requirement of advance warning. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146. Notwithstanding the trial court's finding that no advance notice was required, we hold that even if Paragraph 21 were interpreted to require such advance notice, the court's finding was harmless error. While Leigh contends that he should have received advance notice of his expulsion, his only claim of prejudice resulting from the lack of notice is that he was deprived of his right and interest as a general partner. He has not contended that advance notice would have changed the outcome of the proceedings. Leigh admitted he received full payment of the capital contribution due him. *Leigh v. Francis* (Oct. 17, 1989), Montgomery C.P. No. 88–1477, unreported. Therefore, the court's finding that no advance notice was intended by Paragraph 21, even if erroneous, would constitute harmless error. Accordingly, Leigh's first assignment of error is overruled.

In his second assignment of error, Leigh asserts the general partners' fiduciary duties require that a partner be notified of expulsion proceedings being instituted against him.

In support of this argument, Leigh cites *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198, wherein the court stated that:

"The relation of partnership is fiduciary in character, and imposes on the members of the firm the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, *and of refraining from taking any advantage of one another by the slightest* misrepresentation, *concealment,* threat, or adverse pressure of any kind." (Emphasis added.)

Leigh concedes that no fiduciary duty exists from limited to general partners. However, he submits that Francis's concealment of the ouster proceedings violated the fiduciary obligation which exists between general partners, and deprived him of his rights and interest as a general partner.

It is undisputed that general partners are to act toward each other with the utmost good faith and integrity. *McGrath v. Cowen* (1898), 57 Ohio St. 385, 49 N.E. 338. Moreover, each partner is required to consult and inform his co-partner as to partnership matters or material questions not covered by the partnership agreement. 13 Ohio Jurisprudence 3d (1979) 84–85, Business Relationships, Section 959, citing *Yeoman v. Lasley* (1883), 40 Ohio St. 190.

"It follows from the nature of the relation that a partner will not be permitted * * * to derive special personal profit from a firm enterprise, to engage in a business in competition with that of the firm * * * or to apply firm property to his own use." 13 Ohio Jurisprudence 3d, *supra*, at 85.

Thus, several reasons exist for partners to owe each other fiduciary obligations. First, the duty of good faith deters competition between partners and the partnership. Additionally, it prevents partners from obtaining personal profit from confidential partnership information, as well as from participating in activities which are in direct conflict with the partnership's interests.

The United States Supreme Court considered this issue and stated that:

"[I]t being well settled that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; that he cannot carry on the business of the partnership for his private advantage; that he cannot carry on another business in competition or rivalry with that of the firm * * *; that he cannot be permitted to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member; nor can he avail himself of knowledge or information which may be properly regarded as the property of the partnership * * *." *Latta v. Kilbourn* (1893), 150 U.S. 524, 541, 14 S.Ct. 201, 207, 37 L.Ed. 1169, 1175.

The court in *Holman, supra,* also considered this issue, and stated that "the personal relationships between partners to which the terms 'bona fide' and 'good faith' relate *are those which have a bearing upon the business aspects or property of the partnership* and prohibit a partner, to-wit, a fiduciary, from taking any personal advantage touching those subjects." (Emphasis added). 11 Wash.App. at 209, 522 P.2d at 523.

██ Therefore, a general partner's fiduciary duty applies only to situations where one partner could take advantage of his position to reap personal profit or act to the partnership's detriment.

While Ohio courts have not considered the issue of advance notice of removal proceedings as pertaining to a partner's fiduciary duty, other state courts have addressed this issue.

In *Holman, supra,* two partners expelled from their law firm brought suit against their former partners, contending that they had breached the partnership agreement by failing to give them proper notice of their expulsion, expelling them without cause, and denying them the opportunity to be heard. The partnership agreement provided that "any member may be expelled from the Firm by a majority vote of the Executive Committee." The agreement did not provide for notice, good cause, or a hearing prior to expulsion.

238

The plaintiffs were notified of their expulsion the day after the executive committee, of which the plaintiffs were members, had met informally without them to discuss their expulsion.

The court did not accept the plaintiffs' argument that the agreement contained implied provisions of due process, pointing out that all of the partners, including the plaintiffs, had signed the agreement without including such provisions, and that the expulsion was not initiated in order for the remaining partners to extract financial gain. In conclusion, the court stated that:

"These parties * * * chose to adopt the guillotine approach, rather than a more diplomatic approach, to the expulsion of partners. The actions of defendants were within the contemplation of the agreement. While this course of action may shock the sensibilities of some, to others it may be that once the initial decision is made, the traumatic reaction to that decision is more quickly overcome and the end result more merciful." *Id.*, 11 Wash.App. at 210, 522 P.2d at 524.

Furthermore, "confusion can easily arise when a partnership agreement authorizes the expulsion of members but is silent or vague concerning the procedure to be followed. It should be recognized that expulsion of a partner is an action peculiarly likely to cause litigation * * *. *As to whether or not the agreement should permit a partner to have the benefits of such formalities as a hearing of some sort, notice of any attempt to expel him, or a showing of cause, the firm may wish to dispense with such matters in the hope of providing the quickest and most expeditious method of separation possible.*" (Emphasis added.) Annotation (1985), 72 A.L.R.3d 1226, 1230.

In the instant case, it is undisputed that Leigh was unaware of his impending ouster. Thus, the issue is whether Francis breached her fiduciary obligations to Leigh by not telling him of the partnership's intent to expel him.

We find that a general partner's fiduciary duty applies only to activities where a partner will take advantage of his position in the partnership for his own profit or gain. Taking into account the general partners' past problems and the previous litigation wherein Leigh was found to have acted in contravention of the partnership's best interests, the ouster was instituted in good faith and for legitimate business purposes. While Leigh's complaint mentioned the possibility that the letters sent to the limited partners contained misrepresentations, he did not argue the issue of defamation in his brief; therefore, we need not address this issue. See App.R. 16(B). No allegations were made that Francis acted in an effort to extract personal gain. Where a partner is expelled in order to resolve a partnership schism, there is no violation of the fiduciary duty. *Bretton, supra,* citing *Holman, supra.*

Therefore, we find that Francis's concealment of Leigh's impending ouster did not violate her fiduciary obligation as a general partner. Furthermore, in light of our findings set forth in the first assignment of error, *supra*, the concept of fiduciary duty does not require that "an expulsion clause to be construed so as to require notice, hearing, or a showing of cause where the clause contains no express requirement of such formalities." Annotation (1985), 72 A.L.R.3d 1226, 1229.

 Leigh also contends that March had a fiduciary and contractual obligation to him concerning the collection of capital contributions and distributions of the developer general partner fees, as well as to notify him of communications by and to the co-defendants. In support of this argument, Leigh provided the following citation:

"[C]ourts have concluded that the *broker*, by virtue of his position, owes a fiduciary duty to his customer." (Emphasis added.) *Rolf v. Blyth Eastman Dillon & Co.* (D.C.N.Y.1977), 424 F.Supp. 1021, 1039, affirmed in part and reversed in part (C.A. 2, 1980) 637 F.2d 77.

However, the evidence reveals that March was not a broker, but a syndicator; these two terms are not synonymous. A broker is "an agent employed to make bargains and contracts for a compensation; a dealer in securities issued by others," while a syndicate is "an association of individuals, formed for the purpose of conducting and carrying out some particular business transaction * * * in which the members are mutually interested." Black's Law Dictionary (6 Ed.1990) 192, 1450. While somewhat similar, these terms are not interchangeable.

The agreement between the developer general partners and March states that March's undertakings include, *inter alia*, "[arranging] the private offering of Units to investors * * * through *registered broker-dealers*, to contributed capital to the partnership * * *." (Emphasis added.) The communications which Leigh alleges were a breach of fiduciary duty took place between March and Crescent, not between March Investor Services and Crescent. Therefore, as discussed *infra*, March had no fiduciary duty to Leigh as a limited partner.

Apparently, however, March had a further duty of facilitating communications between the limited partners. Although this obligation does not appear on the face of the agreement between March and Crescent, this fact was not disputed by the appellees. Therefore, we find that a genuine issue of material fact exists as to whether this additional duty involved March in the partnership in such a manner as to create fiduciary duties, and whether March breached its fiduciary duty by not notifying Leigh of the removal proceedings being instituted against him. See *Tri–Growth Centre City, Ltd. v. Silldorf,*

*Burdman, Duignan & Eisenberg* (1989), 216 Cal.App.3d 1139, 1150, 265 Cal.Rptr. 330, 335. Therefore, we find this portion of Leigh's argument persuasive.

Accordingly, Leigh's second assignment of error is sustained in part and overruled in part. The judgment of the Common Pleas Court of Montgomery County granting summary judgment for the appellees and denying partial summary judgment for Leigh will be affirmed in part and reversed in part for further proceedings consistent with this opinion.

*Judgment accordingly.*

WILSON and GRADY, JJ., concur.