In re Jay Gary NEEDLEMAN, Debtor.

John E. HYNES, Plaintiff,

v.

Jay Gary NEEDLEMAN,
Debtor–Defendant,

and

Mark Siefer, Defendant.

Bankruptcy No. 95–15432.
Adv. No. 96–1015.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Jan. 22, 1997.

Christopher R. Heekin, Porter, Wright, Morris & Arthur, Cincinnati, OH, for Plaintiff.

Robert A. Goering, Cincinnati, OH, for Defendant Jay Needleman.

David A. Ferris, Columbus, OH, for Defendant Mark Siefer.

### DECISION

J. VINCENT AUG, Jr., Bankruptcy Judge.

This matter is before the Court on Plaintiff John E. Hynes' Complaint to Determine the Dischargeability of Indebtedness under 11 U.S.C. § 523(a)(4) and (a)(6) as against Debtor–Defendant Jay Gary Needleman. (Doc. 1). Hynes also challenges the validity of a security interest asserted by the non-debtor Defendant Mark Siefer. A trial was held on November 13 and 15, 1996.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

This decision constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

Hynes contends that he was the sole owner of an automobile repair business known as "J's Automotive Engineering[1]" located at 1326 Tennessee Avenue and that Needleman was his employee. Hynes further contends that a security interest in certain tools used at the Tennessee Avenue business granted to Siefer by Needleman is invalid. Hynes contends that Needleman and Siefer removed these tools from the Tennessee Avenue business without Hynes' authority, thereby creating a nondischargeable debt in favor of Hynes in the amount of $24,000.00 pursuant to § 523(a)(4) and (a)(6). Hynes also asserts a claim against Siefer in the amount of $24,000.00. Needleman contends that he and Hynes had a partnership business relationship and, therefore, that there was no conversion of the tools and that the security interest granted to Siefer was valid. Siefer contends that the security interest is valid because he believed Needleman owned the tools.

At the trial, Siefer moved to dismiss the claim against him on the ground that an earlier state court action brought by Hynes against Needleman based on conversion, which resulted in a judgment in the amount of $24,002.70 against Needleman, did not include Siefer as a defendant. The motion was denied at the trial because the evidence showed that Hynes was unaware of Siefer's purported security interest in the tools at the time the state action was filed.

## APPLICABLE LAW

■ Section 523(a)(6) operates to make nondischargeable a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." An injury is willful if it was a deliberate and intentional act which necessarily led to injury. *Perkins v. Scharffe*, 817 F.2d 392, 394 (6th Cir.) *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). An injury is malicious if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will. *Id.* It is

the intent to do the act which is the operational legal event and not the intent to do harm. *In re Lang*, 108 B.R. 586, 590 (Bankr. N.D.Ohio 1989). The intentional tort of conversion creates a nondischargeable debt when it is proven that the debtor intentionally transferred property to one who is not entitled to it without the authorization or approval of the one entitled to the property. *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228–29 (6th Cir.1991).

■ Section 523(a)(4) operates to make nondischargeable a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Federal law defines embezzlement under § 523(a)(4) as the fraudulent appropriation of property by a debtor to whom such property has been entrusted or into whose hands it has lawfully come. *In re Brady*, 101 F.3d 1165, 1172–73 (6th Cir.1996). Although the Sixth Circuit has yet to directly address whether the term "fiduciary capacity" in § 523(a)(4) extends to the relationship between partners, *see In re McLaren*, 3 F.3d 958, 964 at n. 3 (6th Cir. 1993); *cf. In re Brady*, 101 F.3d at 1173–74 (discussing joint venturers), and there is a split of authority on this issue within the Circuit, *see In re Steed*, 157 B.R. 355 (Bankr. N.D.Ohio 1993), we believe that the fiduciary relationship between partners in Ohio under both state statute, *see* Ohio Rev.Code § 1775.20(A), and state case law, *see Arpadi v. First MSP Corp.*, 68 Ohio St.3d 453, 628 N.E.2d 1335, *reh'g denied*, 69 Ohio St.3d 1474, 634 N.E.2d 629 (1994); *Leigh v. Crescent Square Ltd.*, 80 Ohio App.3d 231, 608 N.E.2d 1166 (1992), is sufficient to meet the fiduciary duty contemplated by § 523(a)(4). *See In re Steed*, 157 B.R. at 358; *see also In re Winden*, 120 B.R. 570, 574 (Bankr.D.Colo. 1990) (Colorado case law imposes fiduciary obligation on partners within purview of § 523(a)(4)).

Under either § 523(a)(4) or (a)(6), the plaintiff has the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

---

**1.** The parties sometimes refer to this business as    "J's Auto Repair."

■ Under Ohio law, a partnership is defined as an association of two or more persons to carry on as co-owners a business for profit. Ohio Rev.Code. § 1775.05(A). Since every business relationship is unique, no single fact or circumstance can operate a conclusive test for the existence of a partnership. *In re Estate of Nuss,* 97 Ohio App.3d 191, 646 N.E.2d 504, 507 (1994). Determining the legal nature of a business relationship may be especially hard when the parties have dealt with each other casually. *See id.* Jointly owned property does not in and of itself establish a partnership. Ohio Rev. Code § 1775.06(B). The receipt by a person of a share of profits of a business is prima facie evidence that he is a partner in the business, but no such inference is to be made if the profits were received in payment as wages of an employee. Ohio Rev.Code § 1775.06(D)(2). The nature of the tax returns filed by the business entity is a non-conclusive factor to be considered. *See In re Berger v. Dare,* 99 Ohio App.3d 103, 649 N.E.2d 1316 (1994) (filing of federal partnership tax return not conclusive that partnership existed). Likewise, the existence of a written or oral partnership agreement is a non-conclusive factor to be considered. *See id.*

■ Each partner must contribute something to the partnership, whether it be money, property, labor and skill, or some or all of them; the contributions need not be identical or equal. *See In re Steed,* 157 B.R. at 357–58. All property originally brought into the partnership stock is partnership property. Ohio Rev.Code § 1775.07(A). Property acquired with partnership funds is partnership property. Ohio Rev.Code § 1775.07(B). A partner may not assign his right in specific partnership property except in connection with the assignment of the rights of all the partners in the same property. Ohio Rev. Code § 1775.24(B)(2).

Subject to any agreement between them, partners share equally in partnership profits, Ohio Rev.Code § 1775.17(A), and partners have equal rights in the management and conduct of the partnership business. Ohio Rev.Code § 1775.17(E).

The act of a partner for apparently carrying on in the usual way the partnership business will bind the partnership, unless the partner so acting has no authority to act for the partnership in the particular matter and the person with whom he is dealing has knowledge of the fact that he has no such authority. Ohio Rev.Code § 1775.08(A). Less than all the partners have no authority to do any act which would make it impossible to carry on the ordinary business of the partnership. Ohio Rev.Code § 1775.08(C)(3).

## FINDINGS OF FACT

In 1978, Needleman established an automobile repair company, "J & R Automotive," located at 1326 Tennessee Avenue. In 1987, Needleman, then the sole proprietor of the company, hired Hynes, an automobile mechanic, as an employee. Needleman paid Hynes a weekly salary. At that time, there were at least five other employees of the business.

In March 1989, Fifth Third Bank repossessed all of the items at the shop on which it had a lien. The parties testified that this was between two-thirds to 80% of the equipment at the shop. Paul Coates, a Snap–On–Tool dealer, removed certain Snap–On–Tools, which Needleman has not yet completely paid for, from the shop at Needleman's request "so the bank wouldn't get them." Most of the employees removed their own personal tools and, as compensation for unpaid wages, some company tools as well. As a result of these actions, J & R Automotive was essentially out of business.

Also, at this same time, Needleman was hospitalized for one week for leg surgery. While Needleman was in the hospital, Hynes began making various arrangements to revive the business. Needleman testified that after he got home from the hospital, Hynes called him nightly to discuss how to "keep things going" and how they would "work together when Needleman was able." Hynes testified that they had a "gentleman's agreement"; that they were "friends"; and that he was "trying to help Needleman and make his own living at the same time." Hynes further testified that he "offered Needleman a deal to come work with me." This arrangement

was acceptable to Needleman because he did not know when or even if he would be able to work a full day after the surgery. As it turned out, Needleman began working part-time in July 1989; he did not go back to work full-time until February 1990.

Hynes spoke to the lessor of the Tennessee Avenue property and received permission from him to sublease the property from Needleman. Although Needleman and Hynes did not enter into a written sublease agreement, Hynes made the rental payments with Needleman's knowledge and consent. Also with Needleman's knowledge and consent, Hynes paid off the arrearages on the various utilities. Eventually, Hynes switched the telephone system over to his name. The other utilities remained in Needleman's name because it was "easier" and was "all part of the subletting."

Initially, Hynes made payments on behalf of the business from his personal checking account. (Pl.Ex. 8). Hynes purchased new tools so that the shop could operate. (Pl.Ex. 4 and 6). Hynes also made arrangement with Coates for the return of the Snap–On–Tools in consideration for Hynes' promise to pay the remaining $13,000.00 balance due on the the the tools. (Pl.Ex. 3). The Snap–On–Tool contracts, however, were never changed into Hynes' name. Eventually, by way of weekly payments, the $13,000.00 balance due was paid. Hynes also purchased new labor guides necessary to the operation of a car repair business, as the previous guides had been repossessed and auctioned by Fifth Third Bank. (Pl.Ex.5).

Beginning in April 1989, with Needleman's knowledge and consent, Hynes submitted state sales tax returns in Hynes' name for the business, which was now called "J's Auto Repair." (Pl.Ex.13). Hynes testified that the "J" stood for the first initial of his name (John) and Needleman's name (Jay). Needleman testified that they only slightly changed the name so as not to lose any customers. With Needleman's knowledge and consent, Hynes obtained a vendor's license for J's Auto Repair in Hynes' name. (Pl.Ex.11). Also in April 1989, Hynes opened up a new checking account at Fifth Third Bank in the name of J's Automotive Engi-

neering. Hynes was the only authorized signor for this account. (Pl.Ex.8).

The parties offered conflicting testimony as to how the weekly accounting for the business was performed. Needleman testified that the two men sat down together every Friday and sorted out the bills. Hynes flatly denied this. In any event, after March 1989, Needleman and Hynes began equally sharing the profits of the business, after the payment of basic obligations such as rent, utilities, and uniforms. Both Needleman and Hynes testified that Hynes had full financial control over the business and that Needleman had no financial control over the business. This was done at least in part to protect the business from Fifth Third Bank, to whom Needleman still owed money. Needleman, however, "handled" most of the customers, did most of the billing and estimating, and ordered most of the parts. Needleman testified that the two men shared work responsibilities and worked out who was capable of doing what most profitably. He offered further credible testimony that they split up the work without much discussion because they knew each other so well.

In April 1991, J's Automotive Engineering borrowed approximately $10,000.00 from Fifth Third Bank for the purpose of purchasing equipment and paying taxes for the business. The loan documentation was signed by Hynes and was secured by a $10,000.00 certificate of deposit owned by Hynes. (Pl.Ex.15).

In 1989, 1990, and 1991, Hynes filed federal tax returns indicating himself as the sole proprietor of J's Auto Repair. (Pl.Ex.12).

During the summer of 1991, the business and personal relationship between Hynes and Needleman began to sour. Hynes testified that Needleman was coming in late, was having mood swings, and was receiving too many personal telephone calls on the job. Hynes also testified that Needleman wanted to change the business "on a grand scale," a proposition with which Hynes did not agree. Needleman testified that Hynes had a drinking problem, was having girlfriend problems, and was causing the business to lose customers because of his temper. In the fall of

1991, Hynes spent one month at an alcohol rehabilitation center. During this month, Needleman operated the business, but he did not sign any checks. Needleman also testified that Hynes did unauthorized repair work on a vehicle which resulted in a damage award of $4,500.00 against the business; Needleman believed that Hynes should be solely responsible for this payment. The two men also had a dispute over Hynes' desire to take $10,000.00 from the business to pay off the Fifth Third loan secured by Hynes' certificate of deposit.

On October 17, 1991, Needleman prepared and signed a security agreement in favor of Siefer, securing payment of $45,000.00 and granting a security interest in certain tools. (Pl.Ex. 1 and 3). Siefer testified that he believed the tools were owned by Needleman because some of the tools bore Needleman's initials and because Needleman showed him Snap–On–Tool contracts bearing Needleman's name. Siefer also testified that Needleman picked the $45,000.00 amount because that was the value of the tools being pledged to Siefer. Although Needleman's bankruptcy schedules show a debt to Siefer in the amount of $45,000.00, Needleman testified at the trial that Siefer initially loaned him only $5,000.00. This loan was relative to a gun-selling business that Siefer and Needleman were involved in. At one point, Needleman owed Siefer $17,000.00. At the time of the bankruptcy filing, Needleman owed Siefer $6,400.00.

On the weekend of January 20, 1992, when Needleman knew that Hynes was going to be back in their mutual hometown of Rockaway Beach, New York, to celebrate Hynes' birthday, Needleman, with Siefer's assistance, removed numerous items from the business, including equipment, tools, labor guides, customer/business records (Pl.Ex. 3[2], Def.Ex. 2[3], and Pl.Ex. 5), half the stock (i.e., oil and cleaning supplies), and cash receipts of $1,000.00 and hid the items at Siefer's barn. Needleman testified that he took "all of what he brought in," his "replacement tools," and half the inventory. The total value of the items taken was $24,000.00. Thereafter, Needleman operated a repair shop from Siefer's barn with these items. Hynes testified that the items taken were critical to the continued operation of the Tennessee Avenue business. Hynes was able, however, to re-open the shop within a matter of days. Needleman left behind certain items which Hynes valued at $8,000.00. Needleman testified that he planned his actions about one week in advance and that he wanted to do this in Hynes' absence because he wanted to avoid a physical confrontation with Hynes. Siefer testified that he did not know that Hynes was out of town that weekend.

Thereafter, Hynes attempted to initiate a criminal action against Needleman, but no charges were brought against Needleman. Needleman, however, initiated a state court action against Hynes claiming damages of $300,000.00. Hynes counterclaimed for $24,000.00, being the value of the items taken by Needleman. In January 1993, Hynes obtained a default judgment against Needleman in the amount of $24,002.70. (Pl.Ex.14). Needleman's claim against Hynes was dismissed. (Id.). Thereafter, Hynes attempted to execute on the tools with the assistance of the Butler County Sheriff. Subsequently, Needleman filed his bankruptcy petition and this adversary proceeding followed.

Needleman testified that he still has in his possession all of the items at issue. Hynes has asked that the $24,002.70 judgment be found nondischargeable and that the judgment be offset by the return of the items. Hynes also seeks a judgment against Siefer in the amount of $24,002.70.

## CONCLUSIONS OF LAW

■ After March 1989, Hynes believed that J's Auto Repair was his own business and that Needleman was his employee. Hynes' belief is supported by the tax returns, vendor's license and sales tax returns, all of which were converted to Hynes' name. However, these changes were jointly decided by both Hynes and Needleman and were done for the purpose of evading Needleman's creditors. Furthermore, these factors are

---

**2.** The items listed on Pl.Ex. 3 were items taken by Needleman.

**3.** The items denoted with "JN" on Def.Ex. 2 were items taken by Needleman.

not conclusive of the nature of the business relationship. *See Berger,* 649 N.E.2d 1316. Hynes belief that he was the sole proprietor is also supported by the fact that only Hynes had the ability to write checks for the company. However, Needleman offered credible testimony that the two men together made the financial decisions and that Needleman was kept out of the finances to evade Needleman's creditors and because Needleman had "known money problems."

After March 1989, Needleman believed he was in a partnership with Hynes, but that Needleman was "more than a 50/50 partner." Needleman's belief is supported by the fact that the lease and the majority of the utilities remained in Needleman's name. However, the parties merely failed to disturb the status quo here. More importantly, it became clear from Needleman's testimony that he did not believe he could be an equal partner, much less an employee, in a business that he had established more than ten years before and which he had built up and in which he had great pride of ownership.

We find that beginning in March 1989, Hynes and Needleman were equal partners. This is evident from many factors. Both Hynes and Needleman contributed worth to the business. *See In re Steed,* 157 B.R. 355. Hynes contributed money and his personal services. He exercised financial control over the business. Importantly, he took key steps early on, such as making rent and utility payments, purchasing new tools and obtaining the return of the Snap–On–Tools, all of which allowed for the revival of the business. Had Hynes not taken these actions, there would have been no business whatsoever. Needleman contributed his fourteen year customer base, his good will, his relationship with suppliers, his expertise, and, once his health allowed, his personal services. Hynes and Needleman equally shared in the business profits. *See* Ohio Rev.Code § 1775.06(D)(2). Although Needleman and Hynes did not have a written partnership agreement or even an oral partnership agreement, they treated each other as equal partners and ran the business as if it were a partnership. *See* Ohio Rev.Code §§ 1775.05(A); 1775.17(A); 1775.17(E).

Overall, both individuals had different strengths and weaknesses; supporting each other they enabled the business to restart and to operate successfully for several years.

■ Since property brought into a partnership is partnership property and property acquired with partnership funds is partnership property, all of the items used by the business after March 1989 were partnership property. *See* Ohio Rev.Code §§ 1775.07(A); 1775.07(B). Accordingly, the items taken by Needleman in January 1992 were partnership property. It was a substantial amount of property, apparently enough to allow Needleman to operate his own repair business. Needleman had no authority to remove this partnership property and it was not an act done for carrying on the usual business of the partnership. *See* Ohio Rev.Code § 1775.08.

Needleman's taking of the property was deliberate and intentional. The fact that Needleman took the property when he knew that Hynes would be out of town is indicative of malice. The fact that Needleman took all of the business and customer records was excessive and indicates that he intended to put Hynes out of business. The fact that Needleman attempted to "protect" the property by subjecting it to a security interest in favor of Siefer and the fact that Needleman inflated the debt due to Siefer on his bankruptcy schedules shows ill-will toward Hynes. The fact that Needleman initiated an action in state court against Hynes, asking for damages of $300,000.00, indicates personal hatred. For all of these reasons, we find that Needleman's taking of the property creates a nondischargeable debt under 11 U.S.C. § 523(a)(6). *See Perkins,* 817 F.2d at 394.

■ For the same reasons, we find that Needleman's taking of the property creates a nondischargeable debt under 11 U.S.C. § 523(a)(4). *See In re Brady,* 101 F.3d at 1172–73.

■ We are not persuaded by Needleman's argument that he was "entitled" to half of the property which he took. Partners must not be allowed to take matters into their own hands and attempt to effect a unilateral dissolution outside the appropriate

statutory procedure. Nor are we persuaded by Needleman's argument that some of the tools which he took were "replacement tools" for tools he had once paid for but lost, and, since he had already paid for the tools once, the "replacement tools" were his tools to keep. Not only is this illogical, it is clear that tools purchased with partnership funds are partnership property. *See* Ohio Rev. Code § 1775.07(B).

We find that Siefer's purported security interest in the tools is invalid. Needleman had no authority to grant a security interest in this partnership property. *See* Ohio Rev.Code § 1775.24(B)(2). Furthermore, the security agreement was made relative to personal loans to Needleman unrelated to the automobile repair business of the partnership. *See* Ohio Rev.Code § 1775.08. In view of Siefer's credible testimony that he *believed* the tools to be Needleman's, and in view of Siefer's belief, albeit misplaced, that he had a security interest in the tools, Siefer's actions do not justify the award of a judgment against him.

### DAMAGES

The value of the items taken is $24,000.00, as supported by Hynes' testimony and Hynes' earlier judgment taken against Needleman in state court. We find, therefore, that the debt that is the subject of this adversary proceeding in the amount of $24,000.00 is nondischargeable. This debt may be offset, in all or in part, by the return of the items to Hynes.

IT IS SO ORDERED.