**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 5 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MATTHEW BOWMAN,

      Plaintiff - Appellant,

    v.

SP PHARMACEUTICALS, L.L.C.,
a New Mexico company; SP
ASSOCIATES, INC., a New Mexico
corporation; H. JOSEPH LARSEN;
DONALD E. HAGMAN; and
FERNANDO A. CORREA da COSTA,

      Defendants - Appellees.

No. 99-2317

D. New Mexico

(D.C. No. CIV-98-415-LH/RLP)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** , **ANDERSON** , and **BALDOCK** , Circuit Judges.

---

Appellant Matthew F. Bowman brought this diversity action against SP

Pharmaceuticals, L.L.C. ("SPLLC"), SP Associates, Inc. ("SPINC"), H. Joseph

Larsen, Donald E. Hagman, and Fernando A. Correa da Costa after the individual

defendants expelled him from a management buyout partnership (the "MBO

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Partnership"). Appellant's complaint asserted breach of fiduciary duty, fraud, prima facie tort, derivative usurpation of corporate opportunity and constructive trust claims. The district court granted Defendants' motion for summary judgment on all claims, holding that (1) because Appellant and the individual defendants agreed to abandon SPINC, Appellant may not assert claims on its behalf, and (2) since any opportunity enjoyed by Appellant was contingent on obtaining financing, the bank's independent decision not to finance a transaction involving Appellant requires that summary judgment be granted as to the breach of fiduciary duty and constructive trust claims.

On appeal, Appellant contends that the district court erred in granting summary judgment in favor of Defendants on the breach of fiduciary duty, fraud, derivative and constructive trust claims because: (1) regardless of the bank's position, genuine issues of material fact exist as to whether the individual defendants breached their fiduciary duties to Appellant; (2) triable issues of fact exist regarding the individual defendants' motives and state of mind when they represented to Appellant that he was a partner; (3) the court failed to take into consideration that the Letter of Intent ("LOI") between SPINC and Pharmacia & Upjohn, Inc. ("P&U") was never formally transferred to SPLLC; and (4) a constructive trust may arise because there are triable issues of fact as to whether

the individual defendants breached their fiduciary duties to Appellant. We exercise jurisdiction pursuant to 18 U.S.C. § 1291, and affirm.

## I. BACKGROUND

In early 1996, the individual defendants formed the MBO Partnership to pursue the acquisition of a sterile injectable pharmaceuticals facility (the "Facility") from P&U. Appellant agreed to become the fourth partner in the MBO Partnership in April of 1996. He was to be the vice president of sales and marketing of the acquiring entity and was to hold an equity share in that entity equal to that of each individual defendant. The partners agreed that Appellant would relocate from Ohio to New Mexico after the transaction closed in order to devote his full attention to the new venture.

On May 21, 1996, the four partners incorporated SPINC. Appellant and the individual defendants were SPINC's sole directors, officers and shareholders. [1] In December of 1996, SPINC entered into the LOI with P&U. The LOI referred to Appellant as an officer and director of SPINC and stated that the LOI memorialized recent negotiations for the purchase of the Facility by "SP Associates, or its assignee, which will be controlled by the current owners of SP Associates, Inc." Appellant's App. at 280. The LOI provided that P&U would

---

[1]The SPINC shares apparently were never issued.

sell the Facility to SPINC for $20,550,000 and that P&U would not, until the termination of the LOI, negotiate a sale of the Facility with any other buyer. The LOI was contingent on SPINC obtaining adequate financing.

In January of 1997, the four partners met to discuss the transaction. The results of those discussions are found in a letter from da Costa to Appellant, Larsen and Hagman dated January 28, 1997 (the "da Costa Letter"). The da Costa Letter states that the partners agreed to use NationsBank ("NB") to finance the transaction. Id. at 290. In addition, the da Costa Letter states that the partners, who were SPINC's sole directors, officers and shareholders, unanimously agreed to abandon that entity and use a limited liability company ("LLC") as the acquisition vehicle. Id. at 291.

On January 31, 1997, NB sent a letter to Larsen and Hagman formally proposing to finance the acquisition of the Facility. The proposed equity and ownership split was 40% for NB and 60% for the partners. NB's proposal also recognized that an LLC would be used to acquire the Facility. On March 28, 1997, Larsen, on behalf of the MBO Partnership, formed SPLLC. Larsen and Hagman were the initial members, and Larsen the manager, of SPLLC. The Organizing Operating Agreement authorized Larsen to execute a Membership Subscription Agreement between SPLLC and NB and a new operating agreement between SPLLC, NB, da Costa, Larsen, Hagman and others.

-4-

After receiving data indicating a decrease in the Facility's projected financial performance, NB revised the equity and ownership split in its financing proposal such that its share was increased to 70% and the partners' share was decreased to 30%. However, the partners would retain 60% voting control. The partners attempted in vain to obtain more equity from NB.

Once it became clear that NB would not increase the partners' equity position, Appellant apparently became unsettled about the transaction. It was Appellant's opinion that he had more at stake in the venture than the other three partners because he was the only partner relocating his family and incurring significant additional debt.     Id. at 334. In an attempt to make up for his reduction in equity, Appellant made various written proposals to the other partners on May 27, 1997. Appellant suggested that SPLLC pay him performance bonuses potentially worth millions of dollars, increase his bonus from $35,000 to $45,000 payable immediately, reimburse him for his daughter's private school tuition, pay him a $700 a month car allowance, reimburse him for relocation costs, guarantee a minimum selling price for his home in Ohio and execute an employment contract guaranteeing his salary and bonus for at least two years.     Id. at 513-18.

The individual defendants reacted negatively to Appellant's proposals. Aside from being unwilling to give Appellant a package worth millions of dollars more than their own, they feared that Appellant's attempt to renegotiate his deal

would jeopardize the MBO Partnership's ability to finance the acquisition. On May 28, 1997, da Costa wrote to Larsen and Hagman stating that they should give Appellant written notice that he was expelled from the MBO Partnership. Larsen drafted a memo dated May 29, 1997, informing Appellant that he was no longer a partner in the MBO Partnership. However, the memo was never delivered. Rather, at the urging of Walker Poole of NB, the partners met and reconciled. The individual defendants agreed to provide Appellant with a relocation package and Appellant withdrew his other proposals. On June 2, 1997, shortly after the partners had resolved their differences, da Costa sent Appellant an e-mail stating, "I'm delighted you are on board." Id. at 522. A June 5, 1997, draft of the Subscription Agreement and Representation Letter lists Appellant among the purchasers of membership interests in SPLLC. Id. at 577-80.

In early June 1997, the partners received a draft of the SPLLC operating agreement from NB. It contained a provision allowing NB to force a sale of SPLLC. The forced sale provision intensified Appellant's concerns about the transaction. As a result, on June 10, 1997, Appellant made two alternative proposals to Larsen and NB. First, Appellant proposed to commute from Ohio to New Mexico each week, spending Monday through Thursday at SPLLC's offices in Albuquerque and Friday through Sunday at home with his family in Ohio. Appellant offered to stay in New Mexico any weekend that he was needed and

suggested that the company pay for most of his commuting expenses. In the alternative, he proposed to take a four week leave of absence from his present employer to assist with the transition and startup of SPLLC, help recruit a replacement for himself, return to work for his present employer and participate in SPLLC only as a board member and passive investor.

Both of Appellant's June 10, 1997, proposals were unacceptable to the other partners and to NB. On June 11, 1997, Walker Poole of NB informed Larsen that the bank would not finance any transaction in which Appellant was a participant. Larsen Dep. at 130, id. at 625. The individual defendants decided to expel Appellant from the MBO partnership that day as well. Id. On June 14, 1997, Larsen told Appellant that NB would not fund the transaction if he were involved and that the other partners had decided to proceed without him. Larsen Dep. at 135-36, id. at 628-29. Appellant continued to stress that he would go forward with his investment in the Facility even if he was not involved in management. However, the other partners would not allow him to participate in the deal in any way. SPLLC's purchase of the Facility closed on June 30, 1997. Appellant was not included as an equity member or manager of SPLLC. This action followed.

## II. DISCUSSION

### A.      Fiduciary Duty Claim

It is a well-settled principle of law that partners owe each other a fiduciary duty.  See GCM, Inc. v. Kentucky Cent. Life Ins. Co. , 947 P.2d 143, 149 (N.M. 1997);  Levy v. Disharoon , 749 P.2d 84, 89 (N.M. 1988);   Citizens Bank of Clovis v. Williams , 630 P.2d 1228, 1230 (N.M. 1981); and N.M. Stat. Ann. § 54-1-21 (effective until July 1, 1997).  This fiduciary relationship between partners "imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise."      Bohatch v. Butler & Binion , 977 S.W.2d 543, 545 (Tex. 1998).  Accordingly, "a partner is not allowed to gain any advantage over a co-partner by fraud, misrepresentation or concealment, and for any advantage so obtained he must account to the co-partner."  Levy , 749 P.2d at 89.

The fiduciary duty among partners, however, "applies only to activities where a partner will take advantage of his position in the partnership for his own profit or gain."  Leigh v. Crescent Square, Ltd. , 608 N.E.2d 1166, 1170 (Ohio Ct. App. 1992).  Partners may, without violating the fiduciary duty among them, expel a partner for business reasons.      See St. Joseph's Reg'l Health Ctr. v. Munos , 934 S.W.2d 192, 197-98 (Ark. 1996);   Lawlis v. Kightlinger & Gray , 562

N.E.2d 435, 442 (Ind. Ct. App. 1990);   Waite v. Sylvester  , 560 A.2d 619, 622-23 (N.H. 1989);  Leigh , 608 N.E.2d at 1170;  Bohatch , 977 S.W.2d at 546;  Holman v. Coie, 522 P.2d 515, 523 (Wash. Ct. App. 1974).

The district court granted Defendants' motion for summary judgment on the fiduciary duty claim due to the fact that NB decided that it would not finance a transaction in which Appellant was involved.  Appellant contends that the district court erred in focusing on NB's position because genuine issues of material fact remain as to whether the individual defendants discharged the fiduciary duties they owed to him.  We review a grant of summary judgment de novo, applying the same legal standard used by the district court.    Simms v. Oklahoma  ex rel . Dep't of Mental Health & Substance Abuse Servs.  , 165 F.3d 1321, 1326 (10th Cir.), cert. denied , 120 S. Ct. 53 (1999).  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

There is ample evidence in the record that NB came to an independent conclusion that it would not fund the transaction if Appellant participated.  NB adopted this position after Appellant made his alternative commuting and passive investor proposals.  Appellant claims that it may still have been possible to obtain

NB financing with him as a partner and points to Walker Poole's deposition as evidence of that possibility. Poole stated that he did not know what his response would have been had the other partners accepted Appellant's commuting proposal. Poole Dep. at 208, Appellant's App. at 642. However, Poole also stated that he had concerns about Appellant's stability and was concerned about Appellant's commitment to the transaction. Poole Dep. at 169-70, id. at 387-88. Poole further declared that "it was clear that this was a management team that was not going to work," Poole Dep. at 175, id. at 391, and that he and his colleagues at NB "decided that we certainly weren't willing to commit the kind of capital that we were going to commit to this opportunity with Mr. Bowman as one of the four partners." Poole Dep. at 171, id. at 389. We conclude that the district court's finding that NB independently decided to exclude Appellant from the deal is clearly supported by the record.

Given NB's position, it appears that had the individual defendants decided to include Appellant in the transaction after his second round of proposals, they would have lost their financing for the deal and it would not have happened. Appellant hints that other financing might have been procured, but provides no evidence that other financing was available. Moreover, the record indicates that there was no time to obtain alternative financing. Larsen stated in his affidavit that "I knew that P&U would not provide management additional time to find

acquisition financing other than that being offered by NationsBank. If the transaction did not close promptly, P&U would simply close the facility." Larsen Aff. ¶ 45, id. at 378-79.

Because of NB's position regarding Appellant and the MBO Partnership's inability to raise alternative acquisition financing, the individual defendants were faced with a choice of retaining Appellant as a partner and losing the opportunity to acquire the Facility or expelling Appellant from the MBO Partnership and preserving some chance of completing the acquisition. The fiduciary duties the other partners owed Appellant did not require them to keep him as a partner where doing so meant frustrating the purpose of the MBO Partnership.

Once it was determined that Appellant would be expelled, he was promptly informed. Larsen told Appellant on June 14, 1997, that NB would not fund the transaction if he were involved and that the other three partners were going ahead without him. Larsen Aff. ¶ 44, id. at 378. Appellant understood this communication because he stated in a June 20, 1997, e-mail to da Costa that "Joe and Don want me out." Id. at 524. Appellant's expulsion was again communicated to him on June 27, 1997, and June 30, 1997, in e-mails from da Costa. Id. at 336-43. These communications show that the other partners did not deceive Appellant, but were honest and open about their decision and the reasons therefor. That candor was sufficient to discharge their fiduciary duties to

-11-

Appellant under these circumstances. For the foregoing reasons, we conclude that the district court did not err in granting summary judgment in favor of Defendants as to the breach of fiduciary duty claim.

**B.      Fraud Claim**

"Actionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment." Cargill v. Sherrod, 631 P.2d 726, 727-28 (N.M. 1981). Appellant claims that he was defrauded by the individual defendants. As evidence thereof, he points to a series of communications beginning with da Costa's letter to Larsen and Hagman, dated May 28, 1997, in which da Costa states:

> The position and requests of our estranged partner, as defined in his handwritten note to us dated 5/27 are, in my opinion, totally unacceptable. . . . My suggestion would be to draft a letter to him stating that his positions cannot be accepted by the other partners (or the bank) and that, therefore, we (the three of us) have decide[d] that we will proceed with a partnership of three.

Appellant's App. at 519. The following day, Larsen drafted a memo to Appellant stating, "[a]fter due consideration, we feel that it is in the best interests of all team members involved to release you from the SP Associates and SP Pharmaceuticals LLC team." Id. at 520.

-12-

Larsen's memo to Appellant, however, was never delivered. When the individual defendants informed NB that they were going to expel Appellant, Walker Poole told them that doing so may jeopardize NB's willingness to finance the transaction since Appellant was the only partner with marketing expertise. Poole suggested that the individual defendants meet with Appellant to see if they could work out their differences and keep the management team together. The partners met and were able to resolve their differences. Shortly after this reconciliation, da Costa sent Appellant an e-mail stating, "Dear Matt: I'm delighted you are on board." Id. at 522.

This reconciliation was short-lived. After Appellant made his alternative commuting and passive investor proposals, both the partners and NB decided that he must go. After his expulsion from the partnership and his initiation of this action, Appellant discovered the May 28, 1997, letter from da Costa to Larsen and Hagman and the draft expulsion memo dated May 29, 1997. Appellant had been unaware that his first round of proposals had nearly cost him his partnership. As a result of this discovery, Appellant alleges that the individual defendants intended to expel him from the MBO Partnership all along and that their communications to the contrary, especially da Costa's June 2, 1997, e-mail, intentionally misled him to believe in, and detrimentally rely on, his status as a partner in the MBO Partnership.

The district court granted Defendant's motion for summary judgment on this claim at the summary judgment hearing. Appellant contends that the district court erred in so doing because the aforementioned communications between the individual defendants establish genuine issues of material fact as to their motives and state of mind at the time those communications were made.

The record shows that all parties understood that Appellant was a partner in the MBO Partnership until at least June 10, 1997. It is clear that the individual defendants intended to expel Appellant from the MBO Partnership on May 29, 1997. However, they changed their minds after meeting with Appellant and working out their differences. There is nothing in the record to indicate that the reconciliation between the partners was other than genuine. Moreover, there is nothing in the record that suggests that the individual defendants intended to expel Appellant as of June 2, 1997. As a result, da Costa's June 2, 1997, e-mail to Appellant was not misleading. Rather, it confirmed the recent reconciliation of the partners. It was not until Appellant made further demands that both the partners and NB decided to proceed without him. Because we find that Appellant has failed to demonstrate the existence of any genuine issues of material fact as to the elements of fraud, we conclude that the district court did not err in granting summary judgment on the fraud claim in favor of Defendants.

**C.     Derivative Usurpation of Corporate Opportunity Claim**

Shareholders of New Mexico corporations may bring derivative actions on behalf of the corporation in order to assert the unenforced rights of the corporation.   See Petty v. Bank of N.M. Holding Co.   , 787 P.2d 443, 446 (N.M. 1990).   Appellant contends that the individual defendants breached their fiduciary duties to SPINC by usurping a corporate opportunity that rightfully belonged to SPINC, namely the acquisition of the Facility.   SPINC has never sought to enforce its alleged rights with respect to the purchase of the Facility and Appellant purports to bring his derivative claim in order to vindicate those rights.   [2]

As indicated in the da Costa Letter, Appellant and the individual defendants, the sole directors, officers and shareholders of SPINC, unanimously decided in January of 1997 to use an LLC as the acquisition vehicle for the Facility.   Their decision was based on legitimate business reasons.   The partners wanted to use a flow through entity for the acquisition and they could not qualify as a Subchapter S corporation under the Internal Revenue Code because one of SPINC's shareholders, da Costa, was not a U.S. citizen.   In addition, there were potential tax advantages to an LLC.   Appellant's App. at 291, Larsen Aff. ¶ 28,

---

[2]It appears that Appellant's derivative action is improperly brought under New Mexico law as it fails to meet the requirements of N.M. Stat. Ann. § 53-11-47.  We need not address this issue, however, since we reach the merits of Appellant's derivative claim.

id. at 373. Although the partners agreed to abandon SPINC, they never caused SPINC formally to transfer the LOI to SPLLC.

The district court granted summary judgment in favor of Defendants on Appellant's derivative claim holding that because Appellant was among those who agreed to abandon SPINC in favor of an LLC, he could assert no claims on its behalf in connection with that action. Appellant argues that the district court erred in its holding because the fact that the LOI was never formally transferred to SPLLC establishes that SPLLC and its members, three of whom are directors and officers of SPINC, illegally usurped SPINC's corporate opportunity to purchase the Facility. We disagree.

The decision to abandon SPINC was legal. Aside from its sound business purpose, the decision was made by all of SPINC's directors, officers and shareholders. There was no dissent at the time the decision was made and we will not now allow Appellant to recast himself as a dissenting minority shareholder.

The only complication in our analysis is the existence of the LOI. However, that is easily dispensed with. The LOI itself states that with the exception of the confidentiality and exclusivity provisions, the LOI "does not bind and will not result in any liability o [sic] the part of either party."    Id. at 478. The LOI did not bind SPINC to purchase the Facility. When SPINC's directors, officers and shareholders unanimously decided to abandon that entity in favor of

-16-

an LLC, SPINC effectively backed out of the deal. As a result, the provisions of the LOI, other than the confidentiality provision, no longer had any effect. For the foregoing reasons, we conclude that the district court did not err in granting summary judgment in favor of Defendants as to Appellant's derivative claim.

**D.    Constructive Trust Claim**

Appellant argues that because, as he alleges, the individual defendants evicted him from the MBO Partnership thereby wrongfully appropriating his portion of the buyout opportunity to themselves, he is entitled to a constructive trust. He asserts that "genuine issues of material fact remain as to whether Defendants breached their fiduciary duties, which would entitle Bowman to a constructive trust." Appellant's Br. at 45. "A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." Bassett v. Bassett, 798 P.2d 160, 167 (N.M. 1990). The district court granted summary judgment for Defendants on this claim for the same reasons it granted summary judgment on the fiduciary duty claims, namely that the opportunity for an entity partly owned by Appellant to purchase the Facility was prospective and evaporated when NB decided it would not finance a transaction in which Appellant was involved.

We have already determined that Appellant was legally expelled from the MBO Partnership for legitimate business reasons. In the alternative, Appellant claims that he had a contractual entitlement to participate in the transaction pursuant to the LOI. As discussed above, the only binding provisions of the LOI were the confidentiality and exclusivity provisions. When Appellant and SPINC's other directors, officers and shareholders decided to abandon that entity for purposes of the acquisition, the LOI lost its buyer and the parties started over.

Even if the LOI had been in effect in June of 1997, it would have terminated on June 11, 1997, upon NB's decision not to extend financing for any acquisition in which Appellant was involved. The LOI did not require NB financing, but the record indicates that there was no time to find alternative financing in June of 1997. Larsen Aff. ¶ 45, Appellant's App. at 378-79. As a result, the LOI was terminated since the buyer, an entity involving Appellant, could not obtain financing for the acquisition.

Appellant was not the victim of either a breach of fiduciary duties or a breach of contract. In order for there to be a constructive trust, there must be some underlying wrong giving rise to the equitable duty of the owner of the property to convey it to the party from whom it was wrongfully taken. Because the record shows that the actions taken by the individual defendants were legal, no constructive trust arises. Accordingly, we conclude that the district court did

not err in granting Defendants' summary judgment motion as to Appellant's constructive trust claim.

## III. CONCLUSION

Based on the foregoing, we conclude that the district court did not err in granting Defendant's motion for summary judgment. We therefore AFFIRM the district court in all respects.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge